THE PEOPLE ex rel. William Z. Partello

*v.*

J. S. McCULLOUGH, Auditor.

*Opinion filed June 23, 1904.*

1. CONSTITUTIONAL LAW—*Governor may revoke approval while bill is in his custody.* Section 16 of article 5 of the constitution, providing that every bill passed by the General Assembly shall be presented to the Governor, and if he approve he shall sign it, "and thereupon it shall become a law," does not mean that the Governor cannot revoke his approval while bill remains in his custody.

2. SAME—*when approval of bill is irrevocable.* Approval of a bill by the Governor is irrevocable after the bill, with his approval endorsed upon it and signed by himself, is once deposited in the office of the Secretary of State by the Governor himself or one of his secretaries or clerks.

3. MANDAMUS—*mandamus should not be granted in a doubtful case.* A writ of *mandamus* should not be awarded where the petitioner does not show a clear legal right to the writ and a clear obligation upon the respondent to do the thing sought to be coerced.

4. EVIDENCE—*oral testimony is incompetent to impeach records showing veto of bill.* Oral testimony is not admissible to impeach the records of the office of the Secretary of State showing that a bill was received from the Governor marked returned without approval and accompanied by a veto.

5. NEW TRIAL—*new trial not granted for purpose of introducing inconclusive cumulative testimony.* A new trial will not be granted for the purpose of introducing impeaching testimony, or testimony which is merely cumulative and which is not conclusive in character.

APPEAL from the Circuit Court of Sangamon county; the Hon. ROBERT B. SHIRLEY, Judge, presiding.

This is a petition for *mandamus*, filed on September 3, 1904, by the relator, William Z. Partello, against J. S. McCullough, Auditor of Public Accounts, praying for a writ of *mandamus*, commanding the Auditor to execute and deliver to the relator a warrant on the Treasurer of the State of Illinois for $28,000.00, with interest from April 27, 1893, for the payment to the relator of a balance, alleged to be due to him for labor and materials,

furnished by him in the years 1892 and 1893 for the erec-
tion of certain buildings for the Illinois State Reforma-
tory at Pontiac, Illinois.    The petition alleges that on
May 3, 1901, a bill, known as House Bill No. 376, other-
wise called the "Partello bill," was passed by the House
and Senate of the Forty-second General Assembly of
Illinois; that said bill made an appropriation of the sum
of $28,000.00, with interest as aforesaid, for the payment
to Partello of the said balance, alleged to be due him
under a contract for the erection of said buildings; that
the second section of the bill provided that the Auditor
was directed to issue his warrant upon the State Treas-
urer for said sum to the relator, or his legal represen-
tatives, and the State Treasurer was directed to pay
the same; that the Forty-second General Assembly ad-
journed on May 4, 1901, without said bill having been
passed upon by the Governor of the State; that said
bill was forthwith duly submitted to the Governor for
his approval and signature, and that on the 12th day
of May, 1901, Richard Yates, the Governor of the State,
approved said bill by placing thereon the following en-
dorsement: "Approved, May 12, 1901, Richard Yates,
Governor;" that said bill was on the 13th day of May,
1901, about ten o'clock in the morning filed with James
A. Rose, Secretary of State, with the said endorsement
thereon, and that, by virtue of the constitution, the said
bill became a law and the petitioner was entitled to
his warrant; that, after the bill had been approved and
signed by the Governor and filed with the Secretary of
State, the said Richard Yates, Governor, filed with the
Secretary of State a document purporting to be a veto
of said bill; that said veto was filed after the filing of
said bill in the Secretary of State's office; that said veto
was invalid, void, and of no effect, for the reason that
the Governor had lost jurisdiction over said bill by
approving and signing the same on May 12, and by the
filing of the same, so approved by him, in the office of

the Secretary of State on May 13, 1901; that on the 25th
day of July, 1903, the petitioner made a demand upon
J. S. McCullough, Auditor of Public Accounts, to issue to
the petitioner a warrant on the Treasurer of the State
for the payment of the money appropriated by said bill,
but that the said McCullough, Auditor as aforesaid, re-
fused to issue said warrant, etc.; that relator is entitled
to a *mandamus,* commanding the Auditor to issue said
warrant on the Treasurer in favor of the relator.

The answer of the Auditor, the present appellee, de-
fendant below, admits the regular passage of the bill,
and its proper signing by the presiding officers of the
House and Senate of the Forty-second General Assembly;
that the General Assembly adjourned on May 4, 1901;
that the Governor received the bill on May 10, 1901. The
answer admits the demand made by the relator on the
defendant, and the defendant's refusal to issue the war-
rant, but denies the approval and signing of the bill, and
alleges that the Governor vetoed the same; also, that
some time after July 1, 1901, the relator submitted to the
commissioner of claims his claim against the State, and
that the commissioner found against him. The relator
filed a replication to the answer saying that, when he
submitted his claim to the commissioner of claims, he
was not aware that the Governor had approved and
signed the bill, and then supposed that the veto was
operative and legal, and did not discover the facts in
regard to the approval and signing of the bill, and its
being filed with the Secretary of State, and that the veto
was filed subsequent to such approval, signing and filing
with the Secretary of State, until July, 1903.

Upon the issues thus made the cause was submitted
to the court for trial without a jury; and the court, on
January 6, 1904, found for the respondent, the present
appellee, and denied the writ. The plaintiff below, the
present appellant, excepted, and brings the case by ap-
peal to this court.

The rulings of the court, and the propositions of law submitted to the court, four of which were held as law, and seven of which were refused, raise a question as to the proper construction of section 16 of article 5 of the constitution of 1870.

Besides the assignments of error filed by the appellant, the appellee assigns cross-errors to the effect that the court erred in admitting oral testimony as to the approval of the Partello bill and as to the filing of the same with the approval of the Governor thereon in the office of the Secretary of State.

The bill was produced in evidence, and at the foot of the bill are the word, "not," on one line, and the word, "approved," on a lower line below the word "not." These words are in ink, and have ink lines drawn through them to erase them. Between the words, "not," and, "approved," are extended the words in ink, "returned without approval," and below are "May 12th, 1901, Richd. Yates, Governor." In other words, the following words appear upon the original bill at the foot thereof, in the following shape and form, to-wit:

"~~not~~<br>Returned without approval<br>~~Approved,~~<br>May 12th, 1901,<br>RICHD. YATES,<br>Governor."

LORIN C. COLLINS, and L. A. McDONALD, (CONKLING & IRWIN, of counsel,) for appellant:

A bill having constitutionally passed the General Assembly, been signed by the Speaker of the House and the President of the Senate, been duly presented to the Governor, approved and signed by him within ten days after such presentation, becomes a law, even though signed through mistake or inadvertence.   Const. 1870, art. 5, sec. 16;  *People* v. *Inglis*, 161 Ill. 256;  *State* v. *Whisner*, 35 Kan. 271;  *Hill* v. *State*, 5 Lea, 725;  *Jones* v. *Hutchinson*, 43 Ala. 721;  *Memphis* v. *United States*, 97 U. S. 293;  *Marbury*

v. *Madison,* 1 Cranch, 137; *Hickory* v. *Ellery,* 103 U. S. 423; *Land Co.* v. *Mead,* 60 Vt. 257.

A bill having been duly passed by the General Assembly, and been duly certified to the Governor and filed in the office of the Secretary of State within ten days after such presentation to the Governor, becomes a law, even though signed through mistake or inadvertence. *People* v. *Hatch,* 19 Ill. 283; *Tarlton* v. *Peggs,* 18 Ind. 24; *Corwin* v. *Comptroller General,* 6 Rich. 370; *State* v. *Whisner,* 35 Kan. 271; *Lyons* v. *Woods,* 163 U. S. 663.

When a question is raised as to the time in which a bill became a law or whether it received the Governor's approval and signature, or as to the time the same was filed in the office of the Secretary of State, it is competent for the court to hear parol evidence to determine when the statute became a law or whether it did become a law. *People* v. *Hatch,* 19 Ill. 283; *Spangler* v. *Jacoby,* 14 id. 297; *United States* v. *Allen,* 36 Fed. Rep. 175; *Gardner* v. *Collector,* 73 U. S. 499; *State* v. *Platt,* 2 S. C. 150; *Turley* v. *Logan,* 17 Ill. 151; *Schuyler County* v. *People,* 25 id. 181; *Grob* v. *Cushman,* 45 id. 119; *Prescott* v. *Canal,* 19 id. 324; *People* v. *Starne,* 35 id. 121; *Railroad Co.* v. *Hughes,* 38 id. 174; *Railroad Co.* v. *Wren,* 43 id. 77; *Bedard* v. *Hall,* 44 id. 91; *People* v. *De Wolf,* 62 id. 253; *Hensoldt* v. *Petersburg,* 63 id. 157; *Ryan* v. *Lynch,* 68 id. 160; *Miller* v. *Goodwin,* 70 id. 659; *Happel* v. *Brethauer,* 70 id. 166; *Reeves* v. *Arundel,* Hob. 110; *Plummer* v. *People,* 74 Ill. 361; *Larrison* v. *Peoria,* 77 id. 11.

H. J. HAMLIN, Attorney General, for appellee:

An act found in the office of the Secretary of State, duly authenticated, is presumed to have been duly passed. *United States* v. *Ballin,* 144 U. S. 1.

An enrolled act in the custody of the Secretary of State and having the official attestations, carries on its face a solumn assurance by the legislative and executive departments of the government that it was passed by Congress. *Harwood* v. *Wentworth,* 162 U. S. 547.

A bill passéd by both houses of the General Assembly and presented to the Governor is within the absolute control of the Governor for the full period of ten days, if it remains so long in his possession. He may approve the bill and affix his signature and upon further consideration may erase his signature and veto the bill, and in such case the approval is without effect. *People* v. *Hatch*, 19 Ill. 283.

Upon grounds of public policy as well as upon the ancient and well settled rules of law, a copy of a bill bearing the signatures of the presiding officers of the two houses of the legislature and the approval of the Governor, and found in the custody of the Secretary of State, is conclusive proof of the enactment and contents of a statute, and cannot be contradicted by the legislative journals or in any other mode. *Freeholders* v. *Stephenson*, 46 N. J. L. 173; *Pangborn* v. *Young*, 32 id. 29; *Underground Co.* v. *Attorney General*, 46 id. 270; *People* v. *Burk*, 43 Cal. 460; *Weeks* v. *Smith*, 81 Mo. 538; *Ex parte Wren*, 63 Miss. 512; *County of San Mateo* v. *Railroad Co.* 8 Sawyer, 238.

Departures from this rule have never been extended beyond an inspection of the journals of both branches of the legislature. *Sherman* v. *Story*, 30 Cal. 253; *Harwood* v. *Wentworth*, 162 U. S. 547; *Lyon* v. *Woods*, 153 id. 663; *Walnut* v. *Wade*, 103 id. 689; *Field* v. *Clark*, 143 id. 675.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The question, presented by the record in this case, is whether or not the bill, known as House Bill No. 376, or the Partello bill, as described in the statement preceding this opinion, became a law by being approved by the Governor and filed in the office of the Secretary of State, or whether such bill was vetoed by the Governor, so as never to have become a valid law.

It is admitted that the bill was duly passed on May 3, 1901, by both branches of the Forty-second General As-

sembly, and duly signed by the respective officers of each branch of the General Assembly, and was submitted to the Governor for his approval on the 10th of May, 1901. It is also admitted that the Forty-second General Assembly adjourned on May 4, 1901, six days before the bill was submitted to the Governor, and that on May 12, 1901, Richard Yates, Governor of Illinois, endorsed on said bill the words "approved May 12, 1901, Richard Yates, Governor." It would appear that the bill was first marked "approved," then changed to "not approved;" then that these words were erased, and the words "returned without approval," were written on the bill over the Governor's signature. It is not denied, or at any rate it is clearly shown by the proof, that on May 13, 1901, the bill was filed in the office of the Secretary of State in its present shape, with the words and erasures already indicated endorsed upon it, and that, when so filed, it was accompanied by the veto of the Governor.

It is contended, however, by the appellant that early on the morning of May 13, 1901, and before any veto of the bill, the bill was filed in the office of the Secretary of State with the Governor's approval thereon, and that thereupon the bill became a law; but that thereafter on the same day the Governor withdrew the bill from the office of the Secretary of State, and erased his approval of said bill, and re-filed the said bill with his veto. The position of the appellant is, that the bill became a law when first filed, as thus stated, in the office of the Secretary of State with the Governor's approval, and that the subsequent act of erasing the approval and filing the veto was nugatory. The contention of the appellee is, that the veto was filed in the office of the Secretary of State at the same time when the bill was filed there, and that the bill never became a law; that, when it was filed, it was filed with the endorsements and erasures thereon as they now appear, and as they are indicated in the statement preceding this opinion.

Section 16 of article 5 of the constitution of 1870 provides in the first paragraph thereof, as follows: "Every bill passed by the General Assembly shall, before it becomes a law, be presented to the Governor. If he approve, he shall sign it, and thereupon it shall become a law; but if he do not approve, he shall return it with his objections, to the house in which it shall have originated, which house shall enter the objections at large upon its journal and proceed to reconsider the bill," etc. (1 Starr & Curt. Ann. Stat.—2d ed.—p. 143.) The same section 16 of article 5 also provides, in the last paragraph thereof, as follows: "Any bill which shall not be returned by the Governor within ten days (Sundays excepted) after it shall have been presented to him, shall become a law in like manner as if he had signed it; unless the General Assembly shall, by their adjournment, prevent its return, in which case it shall be filed with his objections in the office of the Secretary of State, within ten days after such adjournment, or become a law." (Ibid. p. 144).

*First*—Appellant contends that, if the Governor wrote the word "approved" upon the bill and signed his name to it, the bill thereby became a law. As we understand the position of counsel for appellant, it is that, when the Governor signed the bill, it became a law before it left his possession, and while it was still under his control, and before it was filed in the office of the Secretary of State. In support of this position counsel quote that portion of section 21 of article 4 of the constitution of 1848 which reads as follows: "Every bill which shall have passed the Senate and House of Representatives shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it with his objections, to the house in which it shall have originated." (Ibid. p. 77). It will be observed that the constitution of 1848 did not contain the words "and thereupon it shall become a law." The constitution of 1848 said, "If he approve, he shall sign it;" but the

language of the constitution of 1870 is: "If he approve, he shall sign it, and thereupon it shall become a law." In view of this difference in the phraseology of the two constitutions, it is contended by counsel for appellant that it was the intention of the framers of the constitution of 1870, that an act, when signed by the Governor, should become a law forthwith by the mere act of his signing it while it was yet in his possession. The case of *People* v. *Inglis*, 161 Ill. 256, is referred to, where this court said (p. 262): "Webster defines the word 'thereupon' as follows: 'Immediately, at once, without delay.' Under this clause of the constitution an act of the legislature becomes a law immediately upon receiving the approval of the Governor."

We are unable to agree with counsel in their contention upon this subject. Under the constitution the Governor has ten days within which to consider a bill that has been presented to him, and to determine whether or not he will approve and sign it, or veto it. If he should sign the bill and mark it approved, he would have a right to reconsider his act, and erase his approval, while the bill still remained under his control, and before the expiration of the time allowed to him by the constitution for its consideration. It has been held by this court that, while the Governor retains a bill within the ten days, it is as much within his control, and his action on the bill is as much subject to reconsideration, as are bills in either house of the General Assembly while remaining before them. It is well known that, where one house passes a bill and sends it to the other house, the house first passing it sometimes requests its return, and, when it is so returned, the vote on its final passage is reconsidered, and the bill then amended or rejected. This court has said that the right to reconsider his action by the Governor before a bill has passed beyond his control is as much secured to him by the constitution, as the right of either house of the legislature to reconsider its

action in the passage of a bill in the manner thus stated. Upon this subject we have said: "The public good no more requires the act of one to be irrevocable than the other. There must be a time when this right to reconsider terminates—and the same rule applies in the one case as in the other—and that is, when the bill or law has passed from the custody or control of the department or body seeking to reconsider. While within such control and custody, the right to reconsider is a necessary incident to the power to act. * * * An individual may erase his name from a deed, no matter how deliberately it may have been signed, at any time before delivery; and even courts of justice may reconsider their most solemn judgments while they are yet before them. And shall the approval of a law by the executive be a solitary exception? Shall his name, once placed to a bill, become irrevocable, although the pen is still in his hand and the ink not yet dry?—even though it may have been placed there by mistake or fraud—inadvertently or unadvisedly? What great principle of public policy requires the adoption of such an iron rule in this solitary case, while in all other cases, whether of public or private concern, a party may reconsider and retract—may change his purpose and his decision, while the subject matter still remains before him? The time, given by the constitution to the executive during which he may retain a bill, shows that it was expected that he would deliberate, consider and reconsider, so long as he chose to retain the bill, within the specified time; and the writing of his name upon it fifty times within that period cannot deprive him of that right, unless he permits the time, given him for that purpose, to elapse, or by passing it beyond his control. While it is yet before him, neither himself nor the public is concluded by anything which he may do. After that his constitutional power is exhausted. The subject matter is gone from him, and he may no longer deliberate or retract. He and all others are con-

cluded. The record, which declares his acts, can alone speak his intentions." (*People ex rel.* v. *Hatch,* 19 Ill. 283).

In the case of *People ex rel.* v. *Hatch, supra,* we said: "Had the Governor returned the bill with his approval upon it to the House, with the message of approval, and without objection, then we think the act would have been beyond his control, and he could not retract his approval, although made by mistake, unless withdrawn by the consent of the House; or had he deposited the law with his approval upon it with the Secretary of State, then it would have passed beyond his control, and its *status* would have become fixed and unalterable, except by appeal; although his approval may have been signified by mistake." It is not the mere signing of a bill by the Governor within the time fixed by the constitution that gives it vitality. He must approve it as well as sign it, and the approval must come before signing. The signing is only required as an evidence of the approval. We see no reason why, if the bill in the case at bar was signed by mistake and without approval by the Governor before it left his possession, and while it was still under his control, he could not erase or cancel the words of approval at any time before it passed beyond his control.

We are, however, of the opinion that, if, in the case at bar, the Governor himself, or through any one of his secretaries or clerks, deposited this bill in the office of the Secretary of State with his approval endorsed upon it and signed by himself, it thereby passed beyond his control, and he had no power thereafter to take the bill from the office of the Secretary of State, and veto it and return it to the Secretary of State's office, accompanied by his veto.

The contention of the appellee is that the Governor marked the bill approved by mistake, and, having discovered his mistake before the bill left his possession, he wrote the word "not" above the word "approved," and then erased both the word "not" and the word "approved,"

and wrote upon the bill the words "returned without approval," and then wrote a veto, and filed the bill with the endorsement thus changed and corrected, and the veto accompanying it, in the office of the Secretary of State.

Whether the contention of the appellant is correct, that the Governor first approved the bill and signed it and filed it in the office of the Secretary of State, and then, after it was so filed, withdrew it and subsequently vetoed it and re-filed it in the office of the Secretary of State with his veto, or whether the contention of appellee is correct as above stated, that the Governor first vetoed the bill, and then filed it in the office of the Secretary of State with his veto without having withdrawn it for the purpose of vetoing it, are questions, which depend upon the proofs introduced in the case.

Involved in this question is another question raised by the cross-errors, assigned by the appellee and by objections made at the time of the introduction of the testimony, and that is, whether it was competent to introduce oral testimony upon this subject, or whether the record evidence only must govern in determining what actually took place.

*Second*—Even if it should be assumed that the oral testimony of witnesses could be resorted to to determine such a question as this, we are of the opinion that the oral testimony did not so far establish the claim of the appellant, as to justify the court below in issuing the writ of *mandamus*. It is well settled that in doubtful cases the writ of *mandamus* should not be granted; and it will not be issued unless the petitioner shows a clear legal right to the writ, or unless the party applying for it shows a clear obligation on the part of the person sought to be coerced to do the thing, whose performance is asked by the issuance of the writ. (*Yates* v. *People*, 207 Ill. 316, and cases there referred to).

We will refer to the oral testimony introduced for the purpose of showing its conflicting character, and for the

purpose of the more easily understanding the record evidence which was introduced with it, and not with any intention of endorsing the practice of introducing oral testimony in cases of this character. The main witness, who testified in support ·of appellant's contention, was one Robbins, who was a resident of New York City at the time he gave his testimony, but had been associated with the Governor from the time of his inauguration until October, 1901; and he testifies that his duties were purely clerical and in the nature of those of a private secretary; that he· was in Springfield on Monday, May 13, 1901, engaged in the performance of his duties; that on that morning he went first to the Governor's mansion and later to the State House;· that the bill was signed on the 12th which was Sunday; that he worked Sunday night and until two o'clock Monday morning at the mansion on bills; that he went to the executive mansion on Monday morning at nine o'clock, or a quarter before nine; that he saw the Governor and the Partello bill that morning. at the mansion; that he took the bill from the executive mansion on the morning of May 13 to John Oglesby, an assistant secretary of the Governor, to make an executive record for the office; that, after Oglesby had made the record, he, Robbins, took the bill from Oglesby with other bills, and filed it in the Secretary of State's office; that this was probably done by half-past nine o'clock; that he does not remember to whom he gave the bill in the Secretary of State's office; that he left it there; that later in the day the Governor asked him to re-claim the bill; that he has no definite recollection as to the hour; that he went to the Secretary of State's office; that he got the bill and gave a receipt for it; that he took it back to the Governor, who made some corrections on it in the presence of the witness; that the bill bore the words, "Approved, May 12, 1901, Richard Yates, Governor;" that the Governor told the witness that he intended to veto the bill, and put the word "not" on it;

that that left the bill to read "not approved, May 12, 1901, Richard Yates, Governor;" that witness suggested to the Governor that the word, "not," might be erased with acid or ink, and that he should put several words down to make it less possible of erasure; that the Governor then put on the bill, "returned without approval," and erased the word "not" and the word "approved;" that the Governor had the veto; that, after the changes had been made on the bill, he, witness, took the veto and the bill to the Secretary of State's office; that it was only out of the Secretary of State's office a few moments; that the night before they had decided at the mansion what bills should be taken over to the State House in the morning; that his instructions were, when a bill was signed, to take it to the Secretary of State's office; that it was a part of his duty as a clerk to do that; that he was present when the bills were sorted out the night before, and that the Governor was aware that the Partello bill was put among the approved bills; that the witness saw the bill in the Governor's hand; that he saw the Governor read it over before its approval, and that he signed it on the day it bears date, May 12, 1901, Sunday. The testimony of the witness, Robbins, is confirmed to a large extent by four witnesses, who say that they went into the office of the Secretary of State on the morning of May 12, 1901, and there saw the Partello bill with the word "approved" on it, signed by the Governor. These witnesses state that the erasures, which now appear upon the bill, were not there, and that the words, "returned without approval," were not there when they saw it. There is nothing in the record to show that any of these witnesses intended to testify falsely, but they may have been mistaken in what they saw. Their evidence shows that they were only in the Secretary of State's office a few minutes. They are unable to say in whose custody the bill was when they saw it. One of these witnesses was a newspaper man who was seeking information for

his paper. One of them happened into the office for the purpose of seeing one of the clerks in the office of the Secretary of State upon a matter of business, not connected in any way with the Partello bill. The other two witnesses had no interest in the bill, except that they had been requested by persons interested in it to ascertain whether it had been approved or not. All the witnesses thus testifying to having seen the bill on that morning were shown at the same time several other bills besides the Partello bill, which had been approved by the Governor, and about whose approval there is no dispute. Some of the evidence tends to show that several bills were handed to each of these witnesses, and it may be that they mistook the approval endorsed upon one or more of the other bills as being an endorsement upon the Partello bill. But whether this explanation of their testimony is correct or not, the testimony on the other side leaves the mind in doubt as to whether or not the bill in question was first filed as an approved bill before it was filed as a vetoed bill.

The Governor testifies that he has no independent recollection of receiving this particular bill more than any other bill; that he remembers writing something in the nature of disapproval; that he has no independent recollection of the exact words used; that he does not remember about the word "approved;" that it evidently is in his handwriting; that all of the words following are in his handwriting; the first word, "not," with a line drawn through it; the second words, "returned without approval," with no line drawn through them; third, the word "approved" with a line drawn through it, and then "May 12, 1901, Richard Yates," and the word "Governor;" that all these words are in his handwriting; that the entries were made by him before the bill was sent to the Secretary of State's office; that he did not intend to approve the bill; that the speaker of the House became critically ill at the end of the session, when a number of

bills failed to reach him after the session adjourned, leaving him something like 188 bills to pass upon in a very few days; that he may have marked this bill "approved;" that to his mind it was evident he had marked it approved and subsequently changed it, but he has no independent recollection of that fact; that he is absolutely certain the changes, if any, were made before the bill left his office; that, for the purpose of avoiding approving or disapproving bills by mistake, it is his practice to read the bills over carefully and put them in piles before signing them in a hurry; that it is possible he may have approved in these three or four days a large number of bills, and approved this one by mistake, and subsequently ascertained that he had done so and endeavored to correct it; that at that session all vetoed bills were endorsed "returned without approval," or with equivalent words; that he prepared the original veto and delivered the same together with bill House Bill 376 at the same time. He refers to a disappearance of the veto, and says of the veto shown him that it is correct and was taken from a letter-press in his office; that he does not remember the date he signed the veto; that he remembers Mr. Neville calling at the executive mansion on Monday, May 13, and speaking to him about the veto of this bill; that it was the day the bill was vetoed; that he thinks he wrote "approved" on the bill, and subsequently corrected it; that he had no intention of signing or approving that bill; that, when he saw the word "approved," he hastened to correct it as soon as he could; that he never approved the bill in a legal sense; that subsequently he made a change and left the bill in the condition it is now in; that Robbins did not bring him the bill in question after it was filed in the Secretary of State's office; that he did not then write the word "not" before the word "approved," nor did Mr. Robbins suggest to him that some person might erase the word "not" and suggest that he write more words, nor did he upon such suggestion write the

words "returned without approval;" that he did not write on the bill the words "returned without approval" after the bill was filed in the Secretary of State's office, or the word "not;" that he did not write anything on the bill after it was filed in the Secretary of State's office; that he did not direct the bill to be filed with the word "approved" on it; that he did not send for the bill and change his approval to disapproval, and file the bill and veto after it had been filed without the veto. John Oglesby testified that he had been secretary to the Governor since about June, 1901; that prior to that time he was assistant secretary in the Governor's office; that it was his duty to receipt from the different houses for all bills presented to the Governor, note his action upon such bills upon the record of the Governor's office, and turn such over to the Secretary of State, and receive his receipt; that he holds in his hand a record of the Governor's office of all bills received from the Senate and the House after they had been passed since the beginning of the session of 1901; that on page 59 appears "H. B. 376" in his handwriting; that the word "vetoed" is in his handwriting; that the entry was made on the morning of May 13; that the bill was brought to him from the Governor from his office at the mansion, directing him to take it to the Secretary of State's office for his receipt; that, before taking bills to the Secretary for the receipt, he entered in a column provided the action taken by the Governor; that the bill was sent to him from the Governor vetoed; that he entered it vetoed and delivered it to the Secretary for his receipt; that the bill was sent from the Governor's private office at the mansion between 11:15 and 12 o'clock; that he wrote "vetoed" in the column because it was headed "approved;" that, when bills are vetoed, we write the word "vetoed" in the column over the date; (witness is handed paper endorsed "H. B. 376," and said,) that he had seen it before in the Governor's office when it was brought to him to be receipted for before bringing it to the attention

of the Governor; that he next saw it on the morning of
May 13; that it was brought to him from the Governor's
private office at the mansion with directions to enter in
"our record," deliver to the Secretary of State and have
his receipt; that he was at the Governor's office at the
State capitol; that, when he received it, he entered it in
the column as vetoed and immediately took it to the Sec-
retary for his receipt; that he made the entry on "this
record;" that he received the bill alone; that the bill at
that time had the word "not" and the word "approved"
in heavy ink; that in the line intervening were written
the words, "returned without approval;" that the word
"not," and the word "approved," two lines under, were
scratched out; that underneath was the signature of the
Governor, May 12, 1901; that the bill, when he received it
from the Governor, was in the same condition it is now;
that the word "not," the word "approved" and the words
"returned without approval" were there at that time;
that he did not receipt for the bill from the messenger;
that he did not receipt to the Governor for it; that he
first saw the Governor on May 13, in the evening; that
the Governor was not at the capitol on that day to his
knowledge; that he occupied the secretary's room at the
capitol; that Mr. Rowe was the secretary of the Gover-
nor; that he took the veto message there when he took
the bill; that he took them over to the Secretary of State
between a quarter after eleven and twelve o'clock; that
he is reasonably sure that he took the bill into the Sec-
retary's office before noon, and took no other bills with it
in the morning; that he remembers exactly because there
had been some talk about the Partello claim, and per-
sons had asked him what he knew about it; that he ex-
amined the veto to see whether it was signed; that he
has not seen the veto since before twelve o'clock on May
13, 1901; that the messenger must have brought it to him
about that time, because the moment the bills were re-
ceived from the Governor he took them immediately over

to the Secretary's office; that he took a receipt from the Secretary of State for the bill.

James S. Neville testifies that he was, at the time of testifying, chairman of the warehouse commission, and in 1901 was attorney for the railroad and warehouse commission; that on Monday morning, May 13, 1901, he came down from Bloomington to Springfield and went to the Governor's mansion; that he had to do with the examining of bills passed by the legislature; read the bills and assisted in reading them; that he knew of the Partello bill and heard a great deal of it; that on that morning he went to the Epler room in the south-east corner, where he read the bills; that the Governor, Mr. Rowe and Mr. Paddock were there; that he saw the Partello bill shortly after he got there; that he found it, and it had been signed and marked "approved, May 12, 1901, Richard Yates, Governor;" that it was in that condition at that time; that he said to the Governor, "Well, you approved the Partello bill;" that the Governor said he had not, and, when he said he had not, he, the witness, handed him the bill; that the Governor said that was a mistake and took his pen and scratched out "approved;" he did that right there in the room at that time; that it was not after half-past ten on Monday; that the Governor took a piece of paper and pen and wrote a veto message right there; that he called someone and sent it to the State House; that he has an impression it was a young colored man, but is not certain; that the Governor wrote the words "returned without approval;" that he, witness, saw the bill when it was sent from the mansion to the State House, and it had those words "returned without approval," on it; that it was in the same condition it now is according to his judgment, and he never saw it from then until now; that the Governor took the bill, made the changes and wrote out the veto in long-hand.

Fred H. Rowe testified that he was private secretary for the Governor in 1901 during the session of the legis-

lature and after the legislature adjourned; that he was
at the Governor's room in the executive mansion on Mon-
day a few days after the adjournment of the legislature;
that he knows James S. Neville, and saw him there some
time between ten and eleven o'clock on that day; that
the Governor was there; that Mr. Neville had been look-
ing over some bills on the desk, and, when the Governor
came in, he picked up one of them and called his atten-
tion to it; that he doesn't remember the exact language
used, but something was said about approving the Par-
tello bill, and the Governor said he had fully made up
his mind to veto it; that the Governor sat down, took the
bill, and wrote for a while; that "he called some colored
man, I don't know who, gave this paper and some other
papers to him, I don't know what, to be delivered at the
State House."

Elmer P. Hill testified that he was clerk in the index
department of the Secretary of State in May, 1901; that
his duty in regard to bills received from the Governor's
office was to receipt for them; that he has a distinct rec-
ollection of receipting for House Bill 376, the Partello
bill; that he receipted to the Governor's clerk on May
13, 1901; that he has a record that he keeps on his table
showing how many bills he received on that day; that
by looking at it he found that there were five bills; that
the second was House Bill 376, William Z. Partello's
claim; that he made that record on receipt of the bills
from the Governor's clerk; that he made an examination
on May 13 of the Partello bill; that he saw the identical
form of it and saw that it was accompanied by the Gov-
ernor's veto, a separate message; (witness was asked to
examine the bill and state what there was on it at the
time he first saw it, on May 13) and he says: "Everything
I see here was there at the time I first looked at it. The
word 'not' was erased or there was a line drawn through
it; 'returned without approval' was as it appears; 'ap-
proved' with a line drawn through it, and 'May 12, 1901;'

the word 'not' was there, with a line drawn through it; the word, 'approved' with a line drawn through it; the words 'returned without approval' were there at that time;" that the bill was accompanied by the Governor's veto; that he has a distinct recollection that he called Mr. Steele's attention to the peculiarity of the return soon after making his desk memoranda; that he took the bill in his hand and talked about the peculiarity of the return; that Mr. Steele had charge of vetoed bills and took charge of bill House Bill 376; that vetoed bills went to Steele's desk in the Secretary of State's office; that he did not actually see what was done with this bill and the separate veto message from the Governor the day it left his charge; that he knows they were together when he received them and he gave them to Steele who took charge of them, but that he does not know what became of the original veto message; that the desk memoranda show all the bills that were received on the 13th; that it is "our record" of bills turned over to the secretary by the Governor; that he, witness, wrote "376" and wrote "vetoed" immediately upon getting the bill from the Governor's clerk on May 13; that, according to his best impression, it was on the afternoon of the 13th between one o'clock and five o'clock; that he receipted for it when he received it, in the Governor's record, and when shown the Governor's record the witness says, "I find my name at the bottom of the page, and am sure that the veto was on there;" that on page 59 of the record of bills appear these words:.

"H. B. 376.—An act making an appropriation to William Partello for balance due him for labor and materials furnished in the erection of the buildings of the Illinois State Reformatory at Pontiac.

May 10, 1901                    Vetoed
Vetoed.            May 11, '01, Elmer P. Hill.        May 13, 1901.

H. B. 376.—App. Wm. Z. Partello Claim."

that he has a distinct recollection that the word "veto" was on that record opposite the Partello bill at the time

he receipted for it in the Secretary of State's office; that the date of May 11, 1901, is a clerical error and should have been the 13th; that he remembered this bill and the veto coming over on Monday, May 13, and its being vetoed in a peculiar manner; that it came over somewhere between one and five o'clock and he received the two together.

Richard Steele testifies that he was executive clerk in the Secretary of State's office and has been since February, 1901; that he took charge of the things that came from the Governor's office, issued commissions and kept the executive records; that he kept a record of bills that are vetoed and kept a record of this veto; that House Bill 376 was received on May 13, 1901, and was accompanied by the Governor's veto; that he does not know at what time he saw it, but it was some time during the afternoon; that the bill is now in the same condition as he saw it on May 13, at which time he examined it; that Mr. Hill called his attention to it and said: "The Partello bill was vetoed," and called him over; that he, witness, looked at the bill and that it was in the same condition as now; that he didn't examine the veto message at that time; that he saw the paper there and took charge of it after Mr. Hill made the endorsements; that he kept all vetoed bills in his desk; that Mr. Spear keeps the approved bills. The witness produced the executive record kept in the Secretary of State's office by him, and it read as follows: "May 13, 1901.—Received this day, H. B. 376 entitled an act making an appropriation to William Z. Partello for balance due him for labor and materials furnished in the erection of the buildings of the Illinois State Reformatory at Pontiac, accompanied by the Governor's veto to said bill;" that he has no other record of this bill; that he recalls Mr. Partello having been there once after the bill had been vetoed; that, after the bill was in the Secretary of State's office, Mr. Partello came in and wanted a copy of the veto, and that witness gave

it to him; that he does not know what became of the original veto message; that it was taken from the office; doesn't know who took it; that it was taken one noon along the last of May, the 30th or 31st; that the record in witness' hand was written up on May 13, and at the same time the bill and the veto were received.

It will be seen from an examination of the foregoing testimony that there is a sharp conflict between the witnesses. The case was tried before the court below without a jury; and, if the trial court based his decision upon the oral testimony alone, we are not able to say that his finding is not sustained thereby.

*Third*—But the practice of introducing oral testimony for the purpose of showing that a law was properly passed or approved, or properly vetoed, is an exceedingly dangerous one, and we have been referred by counsel to no authorities which justify it. In the case at bar, the witnesses, who testify orally to what occurred on May 13, 1901, are testifying to transactions, which happened more than two years before the date of their testimony. Great uncertainty would arise as to the existence or validity of statutes, if every act of the legislature at any and all times should be liable to be put in issue and impeached by parol evidence. "Such a state of uncertainty in the statute laws of the land would lead to mischiefs absolutely intolerable. * * * The result of the authorities in England and in the other States clearly is that, at common law, whenever a general statute is misrecited or its existence denied, the question is to be tried and determined by the court as a question of law,—that is to say, the court is bound to take notice of it, and inform itself the best way it can; that there is no plea by which its existence can be put in issue and tried as a question of fact; that, if the enrollment of the statute is in existence, the enrollment itself is the record, which is conclusive as to what the statute is, and cannot be impeached, destroyed or weakened by the journals of par-

liament or any other less authentic or less satisfactory memorials; and that there has been no departure from the principles of common law in this respect in the United States except in instances where a departure has been grounded on, or taken in pursuance of, some express constitutional or statutory provision requiring some relaxation of the rule, in order that full effect might be given to such provisions; and in such instances the rule has been relaxed by judges with great caution and hesitation, and the departure has never been extended beyond an inspection of the journals of both branches of the legislature." (*Field* v. *Clark*, 143 U. S. 665; *Sherman* v. *Story*, 30 Cal. 276).

Counsel for appellant refer to numerous cases in this State for the purpose of sustaining their contention, that parol evidence may be introduced in such cases as the case at bar.    But the authorities thus referred to do not sustain the position of counsel.    In this State the departure from the common law rule above referred to has never been extended beyond an inspection of the journals of both branches of the legislature.    We have held that, "where an act of the legislature has received the signatures of the speakers of both houses, and the approval of the Governor, such verification is *prima facie* evidence of its validity as a legislative enactment, but the journals of either branch of the legislature may be resorted to for the purpose of overcoming such *prima facie* evidence of its validity; and it may be shown from the journals that an act was not passed in the mode prescribed by the constitution; and, where the journal is silent as to whether any requirement of the constitution in the passage of a bill has been complied with, the silence of the journal is accepted as evidence of such non-compliance." (*People ex rel.* v. *Starne*, 35 Ill. 121; *Illinois Central Railroad Co.* v. *People*, 143 id. 434; *Chicago Telephone Co.* v. *Northwestern Telephone Co.* 199 id. 324; *Spangler* v. *Jacoby*, 14 id. 297.)    Where the constitution has made spe-

cific requirements for the proper passage of a bill, and the journals have been resorted to to ascertain whether or not there has been a compliance with those requirements, no evidence has been admitted beyond that contained in the records themselves. In such case, oral evidence has only been received to identify the journals of the two houses. (*People ex rel.* v. *Starne,* 35 Ill. 121.) In the case of *People ex rel.* v. *Starne, supra,* it was held that a bill, signed by the speakers of the two houses and approved by the Governor, would be conclusive of its validity and binding force as a law were it not for the provision of our constitution which requires that all bills, before they can become laws, shall be read three several times in each house, and shall be passed by a vote of a majority of all the members elect. In that case it was said that, were the question whether the journals might be referred to for the purpose of overcoming the presumption of the validity of a printed act having all the forms of law a question of first impression, "it might be more embarrassing than it now is, having been in numerous cases authoritatively determined, by this and other tribunals of sister States, whose organic laws contain substantially similar provisions to that of ours. In fact, so far as we have been able to find, the decisions, in every case but one, where this question has arisen, hold that the journals may be resorted to for the purpose of invalidating the enactment. We are not, however, prepared to say that a different rule might not have subserved the public interest equally well, leaving the legislature and the executive to guard the public interest in this regard, or to become responsible for its neglect." While the authorities referred to by counsel hold that the journals, in view of certain constitutional requirements, may be resorted to for the purpose of invalidating an enactment, they do not hold that parol evidence outside of the journals can be resorted to for such purpose.

On the contrary, the weight of authority appears to be against the admission of such testimony. In *People ex rel.* v. *Hatch, supra*, where it was held that the Governor might within the period fixed by the constitution deliberate as to the propriety of approving an act of the legislature, and might sign such act and erase his signature thereto at pleasure, and, until it had passed from his control by the constitutional and customary modes of legislation, he might reconsider and retract any approval previously made, it was said: "The record which declares his acts can alone speak his intentions." In *People ex rel.* v. *Starne, supra*, speaking of the introduction of the journals of the two houses of the legislature for the purpose of showing whether or not an act was properly passed, it was said: "Oral evidence was received in the case only to identify the journals of the two houses and these two bills, but for no other purpose." In *Wabash Railroad Co.* v. *Hughes & Selz*, 38 Ill. 174, it was said by this court: "Courts must have some means of knowing when bills are passed, and they must receive such knowledge through the medium of evidence. This they can only know through record evidence, furnished at the time, and by the departments entrusted with the law-making power. Whether bills have or not become laws can only be known from the evidence, which the journals and the original bill with its endorsements afford. If, upon an inspection of a bill, it is found to be duly authenticated, and the journals show that it passed both houses by the number of votes required by the constitution, and the ayes and noes are entered upon the journals, courts will, if a public law, regard and act upon it as such. Courts can never receive oral proof that a law has been adopted, or that any act essential to its validity has been performed." (See also *Illinois Central Railroad Co.* v. *Wren*, 43 Ill. 77). In the latter case of *Illinois Central· Railroad Co.* v. *Wren*, it was said by this court: "The laws, certified by the Secretary of State and

published by the authority of the State, must be received as having passed the legislature in the manner required by the constitution, unless the contrary clearly appears. * * * If counsel say the journal shows a law to have been passed without calling the yeas and nays, let them make the requisite proof of that fact by means of the legislative journals, and introduce that proof into the record. * * * A duly authenticated copy of so much of the original journal, as shows the facts relied upon by counsel for impeaching a law *prima facie* valid, must be brought before us through the record." In *Ryan* v. *Lynch*, 68 Ill. 160, it was held that the certificate of the Secretary of State, showing what proceedings were had in either branch of the General Assembly in relation to the passage of a bill, is competent evidence to show whether or not the same was passed in the constitutional mode; and where such certificate, in due form, purports to give all the proceedings, there can be no inference that any other proceedings were had in relation to the passage of the bill."

Section 3 of chapter 124 of the Revised Statutes, being "An act to revise the law in relation to the Secretary of State," provides that "all public acts, laws and resolutions passed by the General Assembly of this State, shall be carefully deposited in the office of the Secretary of State, and the Secretary of State is charged with the safe keeping of said office, and all laws, acts, resolutions, bonds, papers and records, which now are or shall hereafter be deposited therein." (3 Starr & Curt. Ann. Stat. —2d ed.—pp. 3759, 3760). Section 5 of the last named act provides that, "it shall be the duty of the Secretary of State—1. To keep a fair register of all the official acts of the Governor. * * * 5. To make and keep proper indices to the executive records and all public acts, resolutions, papers and documents in his office." Section 8 of the last named act provides that, "in the publication of the laws of this State, or the resolutions or journals

of the General Assembly, the Secretary of State shall 'cause to be published in each volume a general certificate to the effect that the same as contained in such volume are true copies of the laws, resolutions or journals of the General Assembly, as the case may be, on file in his office; and each volume so certified shall be received as evidence in all courts and places." (Ibid. 3762). Section 10 of said act provides that "whenever any bill, which shall have passed both houses of the General Assembly, and shall not be returned by the Governor, or filed with his objection in the office of the Secretary of State, as required by section 16 of article 5, of the constitution, it shall be the duty of the Secretary of State to authenticate the same by a certificate thereon," which said certificate is set forth in said section.

In *People ex rel.* v. *Hatch, supra,* we said: "This law does not prescribe the mode, in which the laws shall be conveyed to the Secretary's office, but that duty imperatively devolves upon that department; in whose hands, or by whose action, they become finished and acquire vitality. If a law receives the last sanction required by the constitution to give it vitality in the hands of the Governor, either by being approved and signed by him or remaining in his hands for ten days, then the duty of depositing it in the Secretary's office may reasonably devolve upon him."

No record evidence of any kind was introduced upon the hearing of this cause, showing that the Partello bill here under consideration was filed in the office of the Secretary of State as an approved bill, and signed as an approved bill by the Governor. The only evidence to establish the fact, that the bill was filed in the Secretary of State's office as an approved bill, was oral testimony, and that alone. On the other hand, all the record evidence, found to be in the Secretary's office upon this subject and introduced upon the hearing of this cause, was in favor of the position that the bill was filed in

such office as a vetoed bill, and that a veto accompanied such filing. The constitution requires that, when the General Assembly shall by their adjournment prevent the return of a bill to either house of the legislature, and the Governor desires to veto it, it shall be filed with his objections in the office of the Secretary of State within ten days after such adjournment, or become a law. Here, the legislature adjourned on May 4, 1901, and the original bill shows upon its face that it was filed in the office of the Secretary of State on May 13, 1901, within ten days from May 4, 1901, with the objections of the Governor thereto embodied in a veto which accompanied the bill. The endorsements upon the bill show that it was not approved, and do not show that it was approved. If only record evidence can be introduced to show that a bill was not properly passed by the two houses of the legislature, certainly only record evidence can be introduced to show that the Governor filed the bill in the office of the Secretary of State with his objections in case the bill was vetoed by him. The Secretary of State is required by the statute to make and keep proper indices to the executive records and all public acts, resolutions, papers and documents in his office. In the case at bar, records were introduced from the index department of the Secretary of State's office, and these records showed, by entries therein made on May 13, 1901, that on that day the Partello bill was received by the Secretary of State, accompanied by the Governor's veto thereto. It thus appears that the record evidence, properly kept in accordance with the requirements of the statute in the Secretary's office, shows that the bill in question was vetoed, and was filed within the ten days, specified in the constitution, with the Governor's objections. No competent evidence having been introduced to contradict or overcome the showing thus made by the records, the court below was justified in holding that this Partello bill did not become a law, and in refusing to issue

the writ of *mandamus*.  The showing made by the record evidence was not overcome by the incompetent oral testimony.

An act found in the office of the Secretary of State duly authenticated is presumed to have been duly passed. (*United States* v. *Ballin,* 144 U. S. 1; *Harwood* v. *Wentworth,* 162 id. 547).  It is equally true that a vetoed bill, found in the Secretary of State's office with proper record entries showing the filing of such bill accompanied by a veto, is certainly proof that such bill did not become a law in the absence of record evidence tending to show that it did become law.

*Fourth*—It is assigned as error by the appellant that the court refused to grant the motion for a new trial filed by the appellant.  The motion for new trial was based upon the affidavit of the relator, William Z. Partello.  He states that he has been informed that one Leon Rhea in the month of May, 1901, was in the employ of the Secretary of State, and was in the office of the Secretary of State on May 13, 1901, when Robbins brought into the office of the Secretary from the Governor's office several bills to be filed, which said bills had been approved by the Governor, and that among said bills was the Partello bill, and that said Leon Rhea then being in the employ of the Secretary of State, received and receipted for said bills, and the said Leon Rhea has told affiant that he is ready and willing to appear and testify to said facts, and that on the former trial affiant did not know the said Leon Rhea, nor that he could testify to the facts aforesaid.  In his affidavit, relator further sets forth that Mrs. Grace Selby has informed him that in May, 1901, she was a stenographer, employed by Richard Yates, Governor of Illinois, and that on May 13, 1901, one James S. Neville dictated to her a veto of the Partello bill, and that she wrote said veto on a typewriter and delivered the same to the said Neville, and that the said Neville then in the presence of the said Grace Selby signed thereto the name

of Richard Yates, then Governor of Illinois, and that said veto, so signed by the said Neville, was filed in the office of the Secretary of State at Springfield, and that Grace Selby has told him she would testify to said facts, if given the opportunity.

The relator does not produce the affidavits of Leon Rhea and Mrs. Grace Selby or either of them as to what they will testify to upon another trial, but merely states that he has been informed by them that they will so testify. What he proposed to prove by them upon another trial was merely cumulative and impeaching testimony, not conclusive in character. It is well settled that a new trial will not be granted merely for the purpose of admitting inconclusive, cumulative testimony or impeaching testimony. (*Chicago and Northwestern Railway Co.* v. *Calumet Stock Farm*, 194 Ill. 9; *Harter* v. *People,* 204 id. 158; *Knickerbocker Ins. Co.* v. *Gould,* 80 id. 388).

For the reasons above stated, the judgment of the circuit court of Sangamon county is affirmed.

*Judgment affirmed.*