[S. F. No. 21592.　In Bank.　Feb. 10, 1964.]

ROBERT MILLER et al., Petitioners, v. FRANCIS L. GREINER, as City Clerk, etc., et al., Respondents; VIRGINIA C. SHAFFER, as a Member of the City Council, etc., Real Party in Interest.

Ruffo & Oneto, John B. Vasconcellos and Robert J. Williams for Petitioners.

Richard K. Karren, Senior Assistant City Attorney, for Respondents.

Burnett, Burnett, Keough & Cali and John M. Burnett for Real Party in Interest.

TOBRINER, J.—Petitioners, electors and taxpayers of the City of San Jose, seek a writ of mandate to prevent the city clerk of San Jose from holding a special election on April 14, 1964, and from expending city funds for such election.

The sole issue turns upon whether, as a result of the 1963 amendments to the Charter of the City of San Jose, the election of the city manager may be held in even-numbered years or whether it must be held in odd-numbered years in conjunction with the general municipal election. For the reasons set forth below we have concluded that the election must be conducted in odd-numbered years in conjunction with the general municipal elections. We begin by setting forth the relevant city charter provisions and the factual background of the present proceeding.

The pertinent sections of the Charter of the City of San Jose provide as follows. Section 53 (Appointive Officers): "There shall be the following appointive officers ... city manager. ..."

Section 56 (City Manager—Official Head of the City): "The City Council shall appoint a City Manager, who shall hold office at the pleasure of the City Council, and of the electors of the City of San Jose as hereinafter set forth. The name of the City Manager shall hereafter at the municipal election held on the first Monday of May be placed on the ballot in substantially the following form:

" 'Shall (name), the City Manager of San Jose, be retained in office for the ensuing two years.

YES

NO'

...."1

Section 3 (Elective Officers): "The elective officers of the city shall be seven councilmen and a city auditor."

Section 9 (General Municipal Election): "A general municipal election shall be held on the second Tuesday of April of each odd-numbered year, commencing with the year 1965, for the election of elective officers, to fill the elective offices the terms of which will expire in such odd-numbered year, and for such other purposes as the council may prescribe. Any reference to general election in this Charter shall mean a general municipal election."2

The city held its last general municipal election in 1962. Pursuant to the charter, as it then read, the city conducted the election in two steps, with a primary on the second Tuesday in April and a runoff election on the second Tuesday in May. On January 13, 1964, the city council, by Resolution No. 25050 called a special election for April 14, 1964, to

---

1The city adopted section 56, as it now reads, on January 27, 1941. Prior to that date the charter provided only that the city manager held office at the pleasure of the city council. The first election pursuant to the post-1941 section 56 occurred in May of 1942 and elections were held every two years thereafter; the last such election occurred in May of 1962.

2The present section 9 is the culmination of a series of somewhat complicated amendments. Between 1941 and 1952 section 9 provided as follows: "Candidates to be voted for at all general elections under the provisions of this charter shall be nominated in the manner hereinafter prescribed and not otherwise. The first or primary election shall be held on the first Monday in May, 1916, and every second year thereafter ..."

On August 11, 1952, section 9 was amended to provide: "Candidates to be voted for at all general municipal elections under the provisions of this charter shall be nominated in the manner hereinafter prescribed and not otherwise. The primary election heretofore held on the second Monday of May shall be held on the second Tuesday in April, 1954, and every second year thereafter. Wherever in this Charter reference is made to the election on the first Monday in May, it shall be deemed to mean the primary or first municipal election to be held on the second Tuesday in April. ..."

The city adopted the present section 9 on January 31, 1963.

determine whether the city manager, A. P. Hamann, should be retained in office for the ensuing two years.

Petitioners contend that the election of the city manager pursuant to section 56 must be held in odd-numbered years in conjunction with the general municipal elections, as described in section 9 of the charter. Petitioners allege that the special election in 1964 will necessitate the expenditure of between $30,000 and $40,000 of city funds. Respondent admits the allegations respecting the expenditure of city funds, but asserts that an election in 1964 is required by section 56 of the charter.

Before turning to the issues raised by these contentions we dispose of certain procedural matters. ▋ The controversy underlying this proceeding presents a proper subject for mandamus. We have frequently entertained petitions in matters concerning municipal elections (e.g., *Felt* v. *Waughop* (1924) 193 Cal. 498 [225 P. 862]; *Gilmore* v. *Jordan* (1934) 1 Cal.2d 347 [35 P.2d 517]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804 [270 P.2d 481]), and mandamus will issue to compel an officer to conduct an election according to the law. (Code Civ. Proc., § 1085; *Partridge* v. *Devoto* (1905) 148 Cal. 167 [82 P.775]; *Galindo* v. *Walter* (1908) 8 Cal.App. 234 [96 P. 505].) Because of the imminence of the proposed election petitioners have no speedy or adequate remedy in any other court; this court exercises original jurisdiction. (Code Civ. Proc., § 1085.) Petitioners, as taxpayers and electors, may maintain this action. (See *Harnett* v. *County of Sacramento* (1925) 195 Cal. 676 [235 P.445]; *Conn* v. *City Council of the City of Richmond* (1911) 17 Cal.App. 705 [121 P. 714, 719].) In light of our disposition on the merits, we need not consider petitioners' contention that Virginia C. Shaffer is not a proper party to these proceedings.

▋ We turn to an analysis of the pertinent charter provisions. The controversy arises primarily as a consequence of the curious amendatory history of sections 9 and 56. In specifying the time for the city manager election, section 56 provides only that it shall be held on the "first Monday of May" (or as a result of the 1952 amendment to section 9, on the "second Tuesday in April"). The section fails to specify the year for such election. Prior to the 1963 amendment to section 9, this omission did not give rise to any difficulty because the first election pursuant to section 56, held in 1942, and every election thereafter, coincided with the section 9 general municipal election held in even numbered years. The

1963 amendment to section 9 provided, however, that the general municipal election was to be conducted in odd-numbered years beginning in 1965. Thus the gravamen of the problem is whether section 56, which remains silent on the year of the city manager election, incorporates the odd-numbered years schedule of the post-1963 section 9, or whether it continues to operate on a timetable of even-numbered years.

Several factors suggest that the design of the charter provides for the election of the city manager in conjunction with the general municipal election hereafter conducted in odd-numbered years.

We note first that section 56 refers to "*the* municipal election [to be held on the second Tuesday in April] . . ."[3] (Italics added.) The phrasing of this provision suggests that the election of the city manager is to be held at the same time as an election occurring independently of the operation of section 56, that is, the general municipal election to be held on the second Tuesday in April. The demonstrative adjective "the" in the above quoted phrase particularizes the reference to municipal elections and indicates identity with the municipal election previously mentioned in section 9 of the charter, since such election is the only one specifically referred to in the charter and the only election to be held on the second Tuesday in April. (See *Stillwell* v. *State Bar* (1946) 29 Cal.2d 119, 123-124 [173 P.2d 313].)

The above described interpretation of the admittedly ambiguous charter provisions conforms with the over-all design of the charter. The charter establishes a system of unified municipal elections held in alternate years. Thus between 1942 and 1962 the city manager election has been held in conjunction with the general municipal elections. The 1963

---

[3]The literal language of section 56 is, of course, as follows: ". . . to be held on the first Monday in May." As noted, *supra*, however, the 1952 amendment to section 9 provided that, "Wherever in this Charter reference is made to the election to be held on the first Monday in May, it shall be deemed to mean the primary or first municipal election to be held on the second Tuesday of April." The repeal of this provision by the 1963 amendment of section 9 did not revive the portion of section 56 which set the election date as the first Monday in May: "No statute or part of a statute, repealed by another statute, is revived by the repeal of the repealing statute without express words reviving such repealed statute or part of a statute." (Gov. Code, § 9607.) It is noteworthy that the city council, in setting the election for city manager in 1964 chose the second Tuesday in April, rather than the first Monday in May as the appropriate date.

amendment of section 9, substituting a single general election for the two-step primary and runoff system, further indicates an intent to minimize the number and thus the cost of elections.[4]

Moreover, the San Jose voters adopted the 1963 amendment apparently believing that the change to odd-numbered years would enable the city to utilize the county election facilities and thus reduce the cost of elections. The argument submitted to the voters in support of the amendment stated: "A 'YES' vote will facilitate the conduct of municipal elections. It is more advantageous for the City to arrange for the handling of much of the election preparation by the County than to hire its own personnel and keep separate election records. By moving the municipal election a year away from the State primary elections, when the Registrar of Voters is extremely busy, continuation of this cooperation can be assured." The holding of an even-year election would destroy this advantage.[5]

The alternative analysis of the charter offered by respondent does not effectively rebut the above conclusions. Respondent first contends that petitioners' interpretation of the charter will permit the current city manager to remain in office

[4]The argument submitted to the voters in support of the passage of the 1963 amendment stated that, "A 'YES' vote will save the City at least $33,000.00 almost every election year. . . . The new proposal would set the election in April of odd-numbered years and would eliminate the costly run-off election. . . ."

[5]Petitioners advance an alternative interpretation of the charter in support of their cause. They suggest that the city manager is in fact an "elective officer" and thus comes directly within the purview of section 9. Petitioners rely upon *Carter* v. *Commission on Qualifications of Judicial Appointments* (1939) 14 Cal.2d 179 [93 P.2d 140], in which we concluded that the office of associate justice of this court was, for purposes of applying the constitutional provision barring legislators from accepting any state office not "filled by election by the people," an elective office although originally filled by executive appointment since the associate justice must periodically stand for election. Although the procedures for filling the offices of associate justice and San Jose city manager are identical insofar as each office is first filled by appointment and each officer must thereafter stand for an unopposed election, the city manager cannot, for purposes of ascertaining the purport of the San Jose city charter be deemed an elective officer. Section 3 of the charter provides that "the elective officers of the city shall be seven councilmen and a city auditor." The language is manifestly exclusive. Moreover, section 53 of the charter designates the city manager as an appointive officer, and section 56 provides a procedure clearly separate from that set forth in section 9, for filling the office of city manager.

an additional year. But this is merely a temporary extension in his term, and any deleterious effects of such extension are ameliorated by the power of the city council, under section 56, to remove the city manager at will. Moreover, the electors indicated their lack of concern for such extensions in approving the 1963 amendment to section 9 which temporarily lengthened the terms of city councilmen and the city auditor.

Respondent secondly points to the lack of express reference in the 1963 amendments to the city manager or to the section 56 election procedure. He suggests that this indicates a design to retain the even-year timetable under which section 56 operated prior to 1963.

Respondent finally argues that any ambiguity in the charter must be resolved by ruling against limiting or infringing the rights of the electors to exercise the franchise. (See *People* v. *Elkins* (1922) 59 Cal.App. 396, 404 [211 P.34]; *Collins* v. *City & County of San Francisco* (1952) 112 Cal. App.2d 719, 729 [274 P.2d 362]; *Warner* v. *Kenny* (1946) 27 Cal.2d 627, 629 [165 P.2d 889].)

The problem before us compels a choice between two possible interpretations of an ambiguous statutory pattern. The issue ultimately turns upon a determination of whether the policy against limiting the right of the electorate to express itself by the ballot outweighs the expenses and inconvenience of an off-year special election. The parties agree that such a special election in the present case will require an expenditure of $30,000 to $40,000 of the city's funds. Indeed, in the absence of alteration of the election schedule, such cost must recur in subsequent years.

The countervailing consideration emanating from the curtailment of the exercise of the franchise loses much of its force in view of the unique nature of the city manager election itself. It is not the usual election of contending candidates but no more than approval or disapproval of the city manager's continuance in his position for a subsequent period of two years. Finally, as we have stated above, the city council, a fully elective body, retains the power to remove the city manager at will. Hence, in our opinion, the disadvantage of the cost of the election to the city and its voters overbalances the advantage of the more immediate but restricted exercise of the franchise.

Let a peremptory writ of mandate issue commanding respondent not to proceed with the holding of a special election

in 1964 for the purpose of submitting to the electorate the question whether A. P. Hamann shall be retained in the office of city manager of the ensuing two years, and not to expend city funds for such special election. This order is final forthwith.

Gibson, C. J., Traynor, J., Schauer, J., McComb, J., Peters, J., and Peek, J. concurred.