[No. A013812. First Dist., Div. One. Nov. 21, 1985.]

INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL 55, AFL-CIO et al., Plaintiffs and Appellants, v. CITY OF OAKLAND et al., Defendants and Respondents.

[No. A013813. First Dist., Div. One. Nov. 21, 1985.]

INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL 55, AFL-CIO et al., Plaintiffs and Appellants, v. BOARD OF SUPERVISORS OF ALAMEDA COUNTY et al., Defendants and Respondents.

COUNSEL

Duane W. Reno and David & Reno for Plaintiffs and Appellants.

Richard E. Winnie, City Attorney, Sharon D. Banks, Susan Spurlark and Corbett & Kane for Defendants and Respondents.

OPINION

NEWSOM, J.—These consolidated appeals arise from judgments of dismissal entered upon different complaints whereby Local 55, International Association of Fire Fighters, AFL-CIO, and individual plaintiffs endeavored to challenge the validity of two charter amendments purportedly adopted by the City of Oakland.

On March 23, 1976, the Oakland City Council adopted a resolution proposing that Propositions R and S be placed before the electorate in the upcoming municipal election. Proposition R sought to amend article 26 of the city charter by, inter alia, limiting membership in the Police and Fire Retirement System to personnel hired prior to July 1, 1976, and reducing city contributions to the funding of that system. Proposition S sought to repeal sections 2100 and 2102 of the city charter which provide for automatic salary adjustments for police officers and fire fighters based upon the annual percentage change in manufacturing wages in the San Francisco Bay Area.

On April 6 and 7, 1976, the instant complaints were filed. In one, the union, as well as two current members of the retirement system and a taxpayer as individual plaintiffs, sought a declaration that the resolution placing Proposition R on the ballot was invalid on the ground that prior to its adoption the city had not met and conferred with the designated employee representatives as required by the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.).[1] It was also alleged in this complaint that Proposition R, if passed, would deprive the individual appellants of vested pension rights and discriminate between members of the fire department on the basis of race. In the other complaint the union and an individual plaintiff as taxpayer sought a declaration that the resolution placing Proposition S on the ballot was invalid for failure to comply with the same procedural requirements of the Meyers-Milias-Brown Act. Both complaints prayed that the city be enjoined from conducting an election on the respective measures.

On April 13, 1976, the court below, citing *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529 [50 Cal.Rptr. 881, 413 P.2d 825],[2] denied injunctive relief on the ground that it would be improper for the judiciary to interfere with the electoral process. The election was held on June 8, 1976, and both measures passed. Eight days later appellants filed supplemental complaints again alleging violations of the Meyers-Milias-Brown Act and seeking to prevent the measures becoming effective by enjoining the city from filing the text

---

[1]Unless otherwise indicated, all statutory references are to the Government Code. Section 3505 provides: "*The governing body of a public agency,* or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, *shall meet and confer in good faith regarding* wages, hours, and other *terms and conditions of employment* with representatives of such recognized employee organizations, as defined in subdivision (b) of Section 3501, and shall consider fully such presentations as are made by the employee organization on behalf of its members *prior to arriving at a determination of policy or course of action.* [¶] 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent." (Italics added.)

[2]In *Mulkey* the court, in considering the constitutionality of Proposition 14 (an initiative measure which was enacted to overturn state laws curtailing the right of private sellers of real property to discriminate on the basis of race and to forestall future state action that might circumscribe this right), observed that prior to its enactment the unconstitutionality of the proposition had been urged on the court. The court noted that it had stated in the minute order rejecting a petition for mandamus to keep the proposition off the ballot " 'that it would be more appropriate to pass on those questions after the election . . . than to interfere with the power of the people to propose laws and amendments to the Constitution and to adopt or reject the same at the polls . . . .' "

of the charter amendments with the Secretary of State. On June 17, 1976, the trial court, citing *Kevelin* v. *Jordan* (1964) 62 Cal.2d 82 [41 Cal.Rptr. 169, 396 P.2d 585],[3] again denied injunctive relief on the ground that it should not interfere with the legislative process. The charter amendments were subsequently filed with the Secretary of State and became effective as of June 22, 1976. Respondents thereupon moved to dismiss the present actions on grounds that the procedural regularity of the charter amendments could now be challenged only by an action in the nature of quo warranto brought by the Attorney General. This motion was granted on the grounds advanced and judgments entered accordingly, the trial court further opining that respondents would ultimately be likely to prevail either because the charter amendment process does not fall within the purview of the Meyers-Milias-Brown Act or, alternately, that the act's purpose had here been met.[4]

The instant appeals followed. In addition, appellants applied to the Attorney General for leave to file a proceeding in quo warranto attacking the enactment of the amendments. However, all proceedings and actions were stayed pending decisions in *San Francisco Fire Fighters, Local 798* v. *Board of Supervisors of the City and County of San Francisco* and *The People* ex rel. *George Evankovich et al.* v. *City and County of San Francisco,* cases then pending before our high court and raising similar issues regarding the applicability of the Meyers-Milias-Brown Act to the process of charter amendment. Those cases were later remanded to this court for determination in light of *Los Angeles County Civil Service Com.* v. *Superior Court* (1978) 23 Cal.3d 55 [151 Cal.Rptr. 547, 588 P.2d 249].[5] We thereafter filed our opinion in those cases holding that Government Code section 3504[6] provides a charter city with an express exemption from the meet and

---

[3]*Kevelin* held that, regardless of how clearly an initiative measure's unconstitutionality may appear, it would be an intolerable interference with the people's reserved legislative power to prevent the official recordation of their vote on such a proposition by the Secretary of State, and consequently a writ of mandate directing the secretary not to file a statement of the vote was denied without prejudice to the right to challenge the measure's constitutionality after it went into effect.

[4]Between December 1975 and March 1976 there were at least nine meetings attended by representatives of the union and the city at which the subject matter of the proposed amendments was discussed. Although not formally noticed, in these discussions each side made certain proposals to which the other agreed.

[5]In *Los Angeles County Civil Service Com.* the court held that the Legislature did not intend to exempt counties with civil service systems from the meet and confer requirements and that those requirements were not inconsistent with a county charter provision requiring the civil service commission to hold public hearings before amending its rules.

[6]Section 3504 provides: "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order."

confer requirements of the Meyers-Milias-Brown Act in proposing amendments to its charter and that, even absent such an express exemption, article XI, section 3 of our state Constitution's absolute grant of authority to counties' and cities' governing bodies to propose charter amendments might not be restricted or qualified by statute. *San Francisco Fire Fighters* v. *Board of Supervisors* (1979) 96 Cal.App.3d 538 [158 Cal.Rptr. 145], hearing denied in Supreme Court November 8, 1979.

For the next five years the present case languished until in June of 1984 respondents moved this court to dismiss for appellants' failure to diligently prosecute the appeals. Meanwhile (Aug. 23, 1984) our high court issued its opinion in *People* ex rel. *Seal Beach Police Officers Assn.* v. *City of Seal Beach* (1984) 36 Cal.3d 591 [205 Cal.Rptr. 794, 685 P.2d 1145], wherein, without purporting to expressly overrule *San Francisco Fire Fighters, supra,* it disagreed with both of that opinion's alternative rationales and held that the city council of a charter city must comply with the meet and confer requirements of the Meyers-Milias-Brown Act before it proposes an amendment to a city charter concerning the terms and conditions of public employment. Upon our subsequent granting of respondents' then-pending motion to dismiss, a petition for hearing in the Supreme Court was filed and ultimately granted. By the same order the cause was transferred to this court with directions to decide the merits of the appeals.

Before doing so, however, we emphasize that we are not here concerned with the substantive contents of the amendments. Rather, as was true in the court below, only the propriety of the method by which appellants seek to challenge the procedural regularity of their enactment is legitimately before us. We stress this since appellants devote a substantial portion of their argument to an effort to convince us otherwise. Thus, despite the injunctive relief's having been previously denied (it does not appear that appellate review of this action was sought) and despite the fact that the sole remaining remedy prayed of the court below was "that the court declare *void and of no legal effect the purported enactment* of the . . . charter amendment[s] . . ."[7] (italics added), appellants contend that, apart from whether the amendments' enactment violated the Meyers-Milias-Brown Act, their constitutionality (i.e., whether they were either confiscatory of rights vested under the pension plan or racially discriminatory) could have been properly considered by the trial court by merely permitting amendment of the com-

---

[7]Appellants attempt to separate the *resolution* proposing the amendments being placed on the ballot from the *enactment* of the amendments themselves. Since the resolution was indisputably the first step in the "purported enactment of . . . the amendment[s]," i.e., inextricably part and parcel of the procedural regularity of the process of enactment, we view any attempted distinction along these lines as bootless.

plaint and prayer and allowing an action to proceed on this footing. Granting for the sake of argument that they could, however, the fact remains that no such amendment was proffered; and no authority is cited—nor are we aware of any—for the proposition that the trial court was obligated to direct such amendment *sua sponte*. The conclusion we reach here, of course, in no way precludes an individual or group, upon a proper showing of the confiscatory or discriminatory[8] effect of the amendments, from attacking the substantive merits thereof.

█ █ ██ █ With this in mind, the sole issue[9] presented by the instant appeals is whether the trial court erred in dismissing the present actions on grounds that the procedural regularity of the enactment of the charter amendments could be challenged only by an action in the nature of quo warranto (Code Civ. Proc., § 803)[10] brought by the Attorney General.

█ It is of course axiomatic that equity (in whose arsenal declaratory and injunctive relief repose) will not intervene where the remedy at law

---

[8] In any event, appellants have conceded in oral argument that—at least for purposes of these appeals—the amendments are not racially discriminatory.

[9] We are, of course, not here concerned with the trial court's dicta relative to appellants' prospects for ultimate success. We note, however, that for present purposes our high court's holding in *People* ex rel. *Seal Beach Police Officers Assn.* v. *City of Seal Beach, supra,* 36 Cal.3d 591 conclusively settles in the affirmative the issue of whether the charter amendment process falls within the purview of the Meyers-Milias-Brown Act. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) Regarding the lower court's conjecture as to whether the act's purpose might here in any event have been met (see fn. 4, *ante*), while suspecting that this issue will doubtless be a focus of future litigation, the state of the present record renders impossible any evaluation of that prognosis and we express no opinion thereon.

[10] Code of Civil Procedure section 803 provides: "An action may be brought by the attorney-general, in the name of the people of this state, upon his own information, or upon a complaint of a private party, against any person who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise, or against any corporation, either de jure or de facto, which usurps, intrudes into, or unlawfully holds or exercises any franchise, within this state. And the attorney general must bring the action, whenever he has reason to believe that any such office or franchise has been usurped, intruded into, or unlawfully held or exercised by any person, or when he is directed to do so by the governor."

The nomenclature "action in the nature of quo warranto" is here resorted to since "The proceeding in quo warranto has had a peculiar history in California. The 1872 code abolished the writ and substituted a statutory *action,* identical in purpose and effect. (C.C.P. 803 et seq.) Then the Constitution of 1879 included quo warranto in the recital of writs which the *superior court* has jurisdiction to issue. Thereafter, C.C.P. 802 was amended to delete the language abolishing it. It is little more than an academic question whether C.C.P. 803 created a new proceeding in lieu of quo warranto, or set forth a procedure governing the issuance of the writ in the exercise of ·the constitutional jurisdiction. The constitutional revision of 1966, which eliminated reference to quo warranto (Cal. Const., art. VI, § 10, supra, § 5), makes the statute the foundation of the proceeding. In practice, however, both courts and lawyers tend to refer to the remedy as 'quo warranto,' certainly a more convenient term than the chapter title, 'Action for Usurpation of an Office or a Franchise.'" (8 Witkin, Cal. Procedure (3d ed. 1985) p. 645; italics in original.)

(even an extraordinary legal remedy such as quo warranto) is adequate. ■ It is also well-established that, absent constitutional or statutory regulations providing otherwise, quo warranto is the only proper remedy where it is available. (*Cooper* v. *Leslie Salt Co.* (1969) 70 Cal.2d 627, 632-633 [75 Cal.Rptr. 766, 451 P.2d 406]; *San Ysidro Irr. Dist.* v. *Superior Court* (1961) 56 Cal.2d 708 [16 Cal.Rptr. 609, 365 P.2d 753]; *Oakland Municipal Improvement League* v. *City of Oakland* (1972) 23 Cal.App.3d 165, 169 [100 Cal.Rptr. 29].) Since an action in the nature of quo warranto will lie to test the regularity of proceedings by which municipal charter provisions have been adopted, it follows that, once those provisions have become effective, their procedural regularity may be attacked only in quo warranto proceedings. (See *Taylor* v. *Cole* (1927) 201 Cal. 327, 333, 338-340 [257 P. 40]; *County of Santa Clara* v. *Hayes Co.* (1954) 43 Cal.2d 615, 618 [275 P.2d 456]; *Van Wagener* v. *MacFarland* (1922) 58 Cal.App. 115, 120 [208 P. 345]; *Oakland Municipal Improvement League* v. *City of Oakland, supra,* at pp. 168-169.) ■ The rationale is succinctly set forth in *Van Wagener* v. *MacFarland, supra,* at page 120: "The proposition that the regularity of the proceedings by which a public corporation of a municipal character has been called into existence cannot be questioned at the suit of an individual citizen or taxpayer is too well settled to admit now of any debate. The reason upon which this holding is founded is far-reaching and admits of no exception. In theory, public corporations of any character whatsoever, exercising governmental functions, do so by reason of a delegation to them of a part of the sovereign power of the state. Where they are claiming to act and are actually functioning without having complied with the necessary prerequisites, they are usurping franchise rights as against paramount authority, to complain of which it lies only within the right of the state itself."

The above authority—coupled with the fact that *People* ex rel. *Seal Beach Police Officers Assn.* v. *City of Seal Beach, supra,* 36 Cal.3d 591 (which presented an issue identical to the one sought to be adjudicated in the present case) was an action in the nature of quo warranto—would be sufficient to dispose of the present controversy but for the nettlesome problem posed by appellants' claim that, where persons or groups who allege that the enactment of a municipal charter provision has caused an injury to interests peculiar to themselves and differing in kind from the injury suffered by the public in general, "it would be entirely inconsistent with American traditions of individual freedom . . . to give [an executive] officer the ultimate authority to limit access to the courts of those citizens whose rights have been infringed upon by [organs of] the state." ■ ■ ■ ■ ■ The argument is that, given the Attorney General's complete control of pro-

ceedings in the nature of quo warranto,[11] to commit their cause to that officer's unbridled discretion is to abandon them to the position of one having to rely on the fox to protect the hen house. In short, their argument is that their remedy at law is inadequate.

The Attorney General's pivotal role in these matters has its origin deep in the roots of the common law: "The ancient writ of quo warranto was a high prerogative writ in the nature of a writ of right for the king, against one who usurped or claimed any office, franchise or liberty of the crown, to inquire by what authority he supported his claim, in order to determine the right. It . . . commanded the respondent to show by what right, 'quo warranto,' he exercised the franchise, having never had any grant of it, or having forfeited it by neglect or abuse. . . . It was frequently employed during the feudal period, and especially in the reign of Edward I, to strengthen the power of the crown at the expense of the barons. . . . The king, being in pressing need of money, had been persuaded that few or none of the nobility, clergy or commonality, holding franchises under grant from the crown, could produce any charters as evidence of their grants, since most of their charters were either destroyed by wars and insurrections, or lost by lapse of time. He had, therefore, sent proclamations throughout the kingdom, directing that all persons claiming liberties or franchises by grant from any of his predecessors should show before certain persons, nominated for that purpose, by what right or authority they held such liberties or privileges, the result of which was that many franchises which had long been held and enjoyed in quiet possession were seized into the hands of the crown. [¶] . . . . [¶] The original writ of quo warranto was strictly a civil remedy, prosecuted at the suit of the king by his attorney-general, and in case of judgment for the king the franchise was either seized into his hands, if of such a nature as to subsist in the crown, or a mere judgment of ouster was rendered to eject the usurper. No fine was imposed, nor was any other punishment inflicted than that implied in the deprivation of the franchise which had been improperly usurped or illegally exercised." (*High, Extraordinary Legal Remedies* (3d ed. 1896) pp. 544-555.)

Later, the ancient writ fell into disuse, and its place was usurped by the more modern remedy of an information in the nature of quo warranto. Its animating force, however, remained unaltered.

---

[11]"The complaint filed by the relator in a quo warranto proceeding must conform to the changes and amendments suggested or directed by the attorney general; and the relator must not thereafter in any way change, amend, or alter the complaint without the approval of the attorney general. At any and every stage of the proceedings, the attorney general may, at his option, withdraw, discontinue, or dismiss the proceedings, or he may assume management of the proceedings at any stage thereof. In the event the judgment of the trial court is adverse to the relator, no appeal therefrom may be taken without the prior approval of the attorney general." (53 Cal.Jur.3d, Quo Warranto, § 23, p. 453, fns. omitted.)

"As a corrective of irregularities in the administration of municipal corporations, it was always a favorite remedy with the crown. Nor is it matter of surprise that a jurisdiction so effective should, in the hands of corrupt monarchs, have been frequently subverted from its legitimate purposes and used as a means of strengthening the king's prerogative at the expense of his subjects. The most flagrant instances of such abuse of the remedy occurred in the turbulent proceedings which marked the latter period of the reign of Charles II, when the information was used for the purpose of forfeiting the charters of large numbers of municipal corporations throughout the kingdom. By the aid of a subservient judiciary, the king was thus enabled to seize the franchises of many of the principal municipalities, and to remodel them according to the royal will, reserving to the crown in the new charters granted the first appointment of those who should govern the corporation. . . . [¶] Before the statute of Anne [9 Anne ch. 20, A.D. 1710], the information in the nature of a quo warranto was employed exclusively as a prerogative remedy, to punish a usurpation upon the franchises or liberties granted by the crown, and it was never used as a remedy for private citizens desiring to test the title of persons claiming to exercise a public franchise. . . . Hence the information, as a means of investigating and determining civil rights between parties, may be said to owe its origin to the statute of Anne, which authorized the filing of the information, by leave of court, upon the relation of any person desirous of prosecuting the same, for usurping or intruding into any municipal office or franchise in the kingdom. . . . [¶] The information was originally regarded as a criminal proceeding, in which the usurpation of the office or franchise was charged as a criminal offense, and the offender was liable upon conviction to a fine and imprisonment as well as the loss of the franchise which he had usurped. In modern times, however, the information, as a means of criminal prosecution, has entirely fallen into disuse, and it has come to be regarded as a purely civil remedy, which, while partaking in some of its form and incidents of the nature of criminal process, is yet a strictly civil proceeding, used for the purpose of testing a civil right by trying the title to an office or franchise and ousting the wrongful possessor." (*High, supra*, pp. 552-556.)

The history of the action thus reveals an evolution from an exclusively prerogative remedy with prosecutorial trappings to an essentially civil one which is today made the vehicle for the assertion of many rights of both a public and private nature. And, with regard to the conundrum posed by appellant as to whether the ancient proceeding affords an individual sufficient protection against abuse by a government officer in the prosecution of grievances in large part distinctively private in nature such as those in the case at bench, the resolution hinges upon whether the Attorney General's control of the action is judicially reviewable by and responsive to a writ of

mandamus—to the extent that it is, a proceeding in the nature of quo warranto affords an adequate remedy, since the authority to determine whether an individual might proceed to redress his grievance would reside ultimately in the courts.

Unfortunately, the law of our state in this area remains murky, commencing even with the language of the statute itself: "The action *may* be brought by the Attorney General, on his own information or on complaint of a private party. (C.C.P. 803; see 8 Cal Practice 728 et seq.; 16 Am.Jur. P.P. Forms 671 et seq.) And it *must* be brought whenever the Attorney General 'has reason to believe' that the conditions exist, or when he is directed to do so by the Governor. (C.C.P. 803.) ▮ However, this suggestion of a mandatory duty is negated by the qualifying language ('has reason to believe'). Hence he has discretion to refuse to sue where the issue is debatable." (5 Witkin, Cal. Procedure (2d ed. 1971) § 7, pp. 3785-▮ ▮ And while the subject has received but limited judicial attention, despite occasional suggestions that the court may intervene in the event of an extreme abuse of the Attorney General's discretion (*Lamb* v. *Webb* (1907) 151 Cal. 451 [91 P. 102]; *Oakland Municipal Improvement League* v. *City of Oakland* (1972) 23 Cal.App.3d 165 [100 Cal.Rptr. 29]; *City of Campbell* v. *Mosk* (1961) 197 Cal.App.2d 640 [17 Cal.Rptr. 584]; see also Note (1963) 15 Hastings L.J. 222), no such instance of mandamus issuing can be found.

It is, however, contrary to the policy of our law that the power to determine whether an individual shall have the privilege to be heard in the courts in the assertion of private rights should be lodged in any official or tribunal except a court or judicial office. And in a proper case where the proposed relator has an individual right distinct in kind from the right of the general public enforceable by an action in the nature of quo warranto, and where he has presented a proper petition with facts necessary to establish that right, we would not hesitate to hold that mandamus would issue to correct any arbitrary, capricious, or unreasonable action by the Attorney General in his control of such action. Certainly the nominally accusatorial character of the proceeding should not inhibit such review by cloaking the Attorney General's action with a mantle of impenetrable prosecutorial discretion, especially when it appears that the original impetus for the remedy was the penchant of impecunious and uneasy Stuarts for extorting treasure and homage from parsimonious subjects jealous of their rights. We also observe that such a holding would be in accord with decisions of sister states which have considered the matter: "Generally speaking, the institution of a quo warranto proceeding or the making of an application for leave of court to institute it, is a matter within the discretion of the Attorney General or pros-

ecuting attorney, and, in the absence of a statute providing otherwise, the proceeding cannot be instituted or maintained without his consent. In a case which is of purely public interest and does not involve any private or individual right or grievance the foregoing rules have been held to obtain to their full extent, and the discretion of the attorney general or prosecuting attorney has been held to be arbitrary and uncontrollable, and his refusal to act does not confer on a private person a right to proceed. On the other hand, it has also been held that in an exceptional case the court may in its own discretion authorize a private person to proceed notwithstanding the attorney general's refusal to institute proceedings or consent to their institution by another, and that under statute or rule of court the discretion of the attorney general is not arbitrary, but that on the contrary he is subject to the order of the court to file an information in the nature of quo warranto if the court deems such action in the public interest, and that on refusal of the attorney general to act a private citizen may bring such proceedings where essential to vindicate the public right. [¶] Also, in a case within a statute authorizing the attorney general or state's attorney to institute the proceeding, or apply for leave of court to institute it, at the instance of private persons, if private rights or grievances are involved, the consent of the officer is essential, but he has no arbitrary and uncontrolled discretion; the only discretion vested in him is to determine whether the documents and evidence presented to him are in proper legal form and prima facie sufficient, and, if they are, it is his duty to sign the petition and present it to the court." (74 C.J.S., Quo Warranto, § 18, pp. 203-204, fns. omitted.)

Returning to the case at bench, it may be presumed that appellants, now armed with our high court's decision in *People* ex rel. *Seal Beach Police Officers Assn.* v. *City of Seal Beach, supra,* 36 Cal.3d 591, will be deemed by the Attorney General to have stated in the petition now held in abeyance with that office a prima facie case as to the procedural deficiencies of the amendments, and that leave to file the action will be forthcoming. We will not in any case *presume* that the Attorney General will fail to act on a petition in appropriate form and having such a strong indication of merit. Should leave to file not be extended, the reasons for denial are judicially reviewable by way of mandamus.

We accordingly conclude that an action in the nature of quo warranto constitutes the exclusive method for appellants to mount their attack on the charter amendments based upon the city's failure to comply with the Meyers-Milias-Brown Act. The trial court did not err in refusing the equitable relief sought or in dismissing the actions on the jurisdictional grounds that the real party in interest (i.e., the Attorney General) was not before it as plaintiff.

The judgments are affirmed.

Racanelli, P. J., and Elkington, J., concurred.