[No. B058197. Second Dist., Div. Two. Jan 15, 1992.]

JOHN J. PULSKAMP et al., Plaintiffs and Appellants, v.
ELIAS MARTINEZ, as City Clerk, etc., Defendant and Respondent.

**COUNSEL**

McCambridge, Deixler, Marmaro & Goldberg, Bert H. Deixler and Shinaan S. Krakowsky for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Robert Forgnone, Ginger G. Bauer and Valerie L. Flores for Defendant and Respondent.

**OPINION**

NOTT, J.—Petitioner Tom Bradley, the mayor of the City of Los Angeles, mistakenly signed an ordinance passed by the city council authorizing a special election to amend the Los Angeles City Charter. Upon discovering his error, the mayor five days later vetoed the legislation. However, respondent Elias Martinez, the city clerk, announced he intended to include the proposed charter amendment on the ballot for the upcoming June 4, 1990, election. Thereafter, the mayor, in his individual capacity, along with petitioner John Pulskamp, a taxpayer, commenced the present action in the superior court for a writ of mandate, seeking to command Martinez to

exclude the referendum from the ballot. The trial court denied the petition. The charter amendment was placed on the ballot and was subsequently approved by the electorate. This appeal follows. We affirm.

## CONTENTIONS

Petitioners argue the trial court erred by determining (1) that the mayor's signature conclusively evidenced his approval of the ordinance calling for the ballot measure, and (2) that the city clerk could knowingly take advantage of the mayor's mistake. Respondent counters that (1) petitioners lack standing to challenge enacted legislation, (2) the passage of the charter amendment renders the appeal moot, and (3) under the circumstances of this case, any procedural irregularity in the legislative process is beyond the inquiry of the judiciary.

## FACTS

On two earlier occasions, once in the mid-1980's and the other as recently as the spring of 1990, Mayor Bradley vetoed ordinances that would have placed on the ballot proposed charter amendments granting the city council the power to review the decisions of the numerous citizen boards and commissions that supervise municipal agencies. The mayor appoints the board and commission members; and up until the instant election, their actions were generally not subject to review by the council.

In February 1991, the city council again began considering whether to pass an ordinance calling for an election to determine if the council should have the power of review over decisions made by the commissions and boards. Learning of the council's action, the mayor instructed his staff to lobby community and business leaders, along with council members, for their support to avoid an override of his future veto. The mayor's opposition to the measure was also widely reported in the press.

On March 6, 1991, the council passed the ordinance (No. 166733) and that same day transmitted the legislation to the office of the mayor's chief administrative assistant, Anton Calleia. Calleia's secretary, though, was unaware of the mayor's objection to the ordinance. She thus prepared the file containing the legislation, as was her custom, by attaching to the folder a summary of the proposed charter amendment and a signature page. She then

placed the package on a pile of files on the left hand side of Calleia's desk. The stack of folders eventually grew to be a foot high in size.

Ordinarily, Calleia reviewed each file before forwarding it to the mayor. However, the file containing ordinance No. 166733 was inexplicably taken to the mayor's office without a veto message affixed to it. On March 7, 1991, the mayor signed the measure, although he could not later recall placing his signature on the document or reading its summary. The legislation was then distributed to the custody of the city clerk's office. On March 11, 1991, the city clerk published the ordinance in the Los Angeles Daily Journal newspaper.

The mayor's staff, now cognizant of the mistake, consulted with the city attorney's office for advice. At the direction of the city attorney, Mayor Bradley wrote to the city clerk stating he signed ordinance No. 166733 in error and desired to have the file returned to his office. On March 12, 1991, the mayor's staff reclaimed the folder, and Mayor Bradley later that day issued a veto of the ordinance.

The next day, the city council debated the effect of the mayor's veto and sought an opinion from the city attorney. On March 18, 1991, the city attorney advised the city clerk that absent the mayor's actual approval of the legislation, the ordinance had not been adopted and was of no effect.

The council assembled on March 22, 1991, to consider the mayor's veto. At the meeting, the city attorney opined that the city clerk lacked authorization to place the proposed charter amendment on the ballot unless the mayor's veto was overridden by the council. The council ignored that opinion and passed a motion ordering the city clerk to prepare the proposed charter amendment for the election.

On April 2, 1991, the city attorney advised the city clerk that the latter did not have the authority to include the charter amendment on the ballot without the city council first overriding the mayor's veto. The city clerk thereafter communicated a request to the council that the ordinance be placed on its agenda for a vote to override the veto. The city council, though, chose not to act on the matter.

On April 23, 1991, the mayor and John Pulskamp commenced the present action in superior court. Following the submission of numerous depositions and declarations, the trial court issued a detailed and well-considered 16-page minute order denying the petition. The court stated, in part: "The record demonstrates that the Mayor's signing of Ordinance 166733 was inadvertent,

that the Mayor opposed that ordinance, and that the inadvertence was the product of both mistakes by the Mayor's staff assistants and by the Mayor himself. . . . The court finds that the Mayor's conduct in this respect was negligent, that there has been no adequate showing that it constituted excusable neglect, and that the error was not a mere clerical error in the sense that term is used in the authorities permitting judicial correction of a clerical error in a judgment. . . . One would have to [not look] at the document at all in order to have a misapprehension about what it was."

## DISCUSSION

### I. Whether Petitioners Have Standing to Challenge the Charter Amendment

■ Characterizing the present litigation as an attack on enacted legislation, respondent asserts petitioners have no standing to pursue their claim. Under respondent's view, only the Attorney General can seek to invalidate the charter amendment, on the grounds of legislative irregularities, by commencing a quo warranto action in the name of the People pursuant to Code of Civil Procedure section 803.[1] We disagree.

■ An action in the nature of quo warranto is derived from the common law writ used in England by the King's Attorney General to test the validity of franchises or claims asserted by subjects of the crown. (*International Assn. of Fire Fighters* v. *City of Oakland* (1985) 174 Cal.App.3d 687, 695-696 [220 Cal.Rptr. 256], citing High, Extraordinary Legal Remedies (3d ed. 1896) pp. 544-555.) Today, relief traditionally granted by the writ, such as a challenge based on purported irregularities in the legislative process of a charter amendment which has taken effect, must be accomplished through the command of section 803. (*Taylor* v. *Cole* (1927) 201 Cal. 327, 333 [257 P. 40]; *Oakland Municipal Improvement League* v. *City of Oakland* (1972) 23 Cal.App.3d 165, 168-169 [100 Cal.Rptr. 29]; *County of Santa Clara* v. *Hayes Co.* (1954) 43 Cal.2d 615, 618 [275 P.2d 456]; 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 6, p. 645.)

On the other hand, when an action in quo warranto is not available, a private citizen may proceed to seek relief by other means. In *Amer. Distl. Co.*

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

Section 803, in relevant part, provides: "An action may be brought by the attorney-general, in the name of the people of this state, upon his own information, or upon a complaint of a private party, against any person who usurps, intrudes into, or unlawfully holds or exercises any public office, civil or military, or any franchise, or against any corporation, either de jure or de facto, which usurps, intrudes into, or unlawfully holds or exercises any franchise, within this state. . . ."

v. *City Council, Sausalito* (1950) 34 Cal.2d 660 [213 P.2d 704, 18 A.L.R.2d 1247], petitioner commenced a mandamus proceeding to compel the city council to terminate its attempt to annex petitioner's property. The California Supreme Court rejected the council's contention that a writ should not be issued because petitioner had a remedy at law. "Quo warranto has been invoked or designated as the appropriate remedy in cases where annexation proceedings *have been completed* and the municipal corporation or district *is exercising* control over the territory. [Citations.] But where the annexation proceedings *were not completed* at the time relief was sought the courts have entertained petitions in mandate or certiorari. [Citations.] It is thus apparent that when the remedy by quo warranto has not matured it is not deemed plain, speedy and adequate for the purpose of controlling the performance of a statutory duty. And since mandate appeared to be the only effective remedy available to the petitioner by which performance of the legal duty could be procured, the trial court did not abuse its discretion in granting the writ." (*Id.* at p. 667, italics added; see also *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 271-272 [118 Cal.Rptr. 249, 529 P.2d 1017].)

 We think it manifest that at the time when petitioners in the case at bar instituted their lawsuit, a quo warranto action by the Attorney General would not have been proper. The city's right to amend its charter had yet to be perfected, for a charter amendment of a city does not take force until filed with the Secretary of State. (Cal. Const., art. XI, § 3, subd. (a); see also *Taylor* v. *Cole, supra*, 201 Cal. 327, 333, 338.)

Furthermore, it must be remembered that for purposes of this appeal, petitioners' right to relief was fixed by the facts existing at the time they commenced their action. (*Amer. Distl. Co.* v. *City Council, Sausalito, supra*, 34 Cal.2d 660, 666.) As explained, quo warranto was not available to them. Their sole remedy was a petition for mandamus at the trial court level, to compel the election officials to carry out their ministerial duty to properly prepare a ballot. (*Gilmore* v. *Jordan* (1934) 1 Cal.2d 347 [35 P.2d 517]; *French* v. *Jordan* (1946) 28 Cal.2d 765, 767 [172 P.2d 46]; *Gage* v. *Jordan* (1944) 23 Cal.2d 794, 800 [147 P.2d 387]; *Miller* v. *Greiner* (1964) 60 Cal.2d 827, 830 [36 Cal.Rptr. 737, 389 P.2d 129].) It logically follows that petitioners have standing to appeal the trial court's denial of that requested relief.[2]

---

[2]At oral argument, respondent urged that we should not rely upon *Bozung*, which was decided in the context of a local agency formation commission's power to approve a city's annexation of property. Instead, respondent referred us to the decision in *International Assn. of Fire Fighters* v. *City of Oakland, supra*, 174 Cal.App.3d 687 as authority requiring this appeal to be dismissed because only the Attorney General in a quo warranto proceeding is empowered to question whether a charter amendment was properly enacted. There, the city council adopted resolutions submitting to the voters proposed charter amendments which reduced the

II. *Whether the Passage of the Charter Amendment Renders*
*Petitioners' Mandamus Action Moot*

 Respondent claims petitioners' lawsuit is now moot because the electors of the City of Los Angeles passed the charter amendment. Clearly, had the voters rejected the measure, this appeal would be without a controversy. (*Finnie* v. *Town of Tiburon* (1988) 199 Cal.App.3d 1, 10-11 [244 Cal.Rptr. 581].) A dispute, however, does exist because a determination that respondent had placed vetoed legislation on the ballot would lead to the inescapable conclusion that the charter amendment is a nullity. (See *City and County of S.F.* v. *Boyd* (1943) 22 Cal.2d 685, 692 [140 P.2d 666].) Because the courts are authorized to enjoin the submission to the electorate of a measure wholly void and inoperative even if adopted by the voters (*Harnett* v. *County of Sacramento* (1925) 195 Cal. 676, 683 [235 P. 445]; *Miller* v. *Greiner, supra,* 60 Cal.2d 827, 830), we think it necessarily follows that the electors of the City of Los Angeles would lack the power to ratify a defective ballot measure.

III. *Whether the Mayor's Signature Is Conclusive Evidence of*
*His Approval of the Ordinance After the Legislation Is*
*Deposited With the City Clerk*

The Los Angeles City Charter provides three methods for an ordinance passed by the city council to become law. First, after the legislation is signed by the city clerk it is "presented to the Mayor for his approval and for his signature if he approves it. . . ." (City Charter, art. 3, § 29.) Should the

employment and pension benefits of the municipality's fire fighters and police officers. The firefighters union and private citizens commenced actions to enjoin the council from placing the measures on the ballot, contending that the city had committed an irregularity in the legislative process by not first meeting and conferring with employee representatives as required by law. The trial court refused to give the plaintiffs injunctive relief, and the ballot measures were subsequently passed by the voters. The plaintiffs then filed supplemental complaints seeking, as described by the appellate court, "to prevent the measures [from] becoming effective by enjoining the city from filing the text of the charter amendments with the Secretary of State." (*Id.* at pp. 690-691.) The trial court again denied the plaintiffs injunctive relief.

After the charter amendments were accepted by the Secretary of State, the city obtained dismissals of the actions on the grounds that the procedural regularity of the legislative process could now only be challenged in a quo warranto action. (174 Cal.App.3d at p. 691.) The appellate court affirmed the dismissals.

First, we find *International Assn. of Fire Fighters* to be distinguishable from the procedural posture of the present lawsuit. The plaintiffs there apparently did not appeal from the orders denying them injunctive relief (174 Cal.App.3d at p. 692), as is the case in this litigation. Second, and more importantly, the court in *International Assn. of Fire Fighters* did not take into consideration the holdings of our Supreme Court in *Amer. Distl. Co.* and *Bozung.* We see no reason why the underlying rationale of *Amer. Distl. Co.* (that where the remedy of quo warranto has not matured a party may seek a writ of mandate) should not apply to the facts of this case.

mayor, within 10 days of its presentation to him, fail to return the legislation with his objections to the city clerk, the ordinance "shall become effective and be as valid as if the Mayor had approved and signed." (*Id.* § 30.) Finally, if the mayor returns the ordinance with his objections in writing, the city council has the authority within the next 60 days to override the veto. (*Id.* § 29.)

■ Because the mayor mistakenly signed ordinance No. 166733, legislation he obviously intended to veto, petitioners urge that the referendum should never have been placed on the ballot and submitted to the electorate. They assert the mayor's mere signature was insufficient, under the mandatory directive of the city charter, to allow the ordinance to take effect. Without the concomitant mental state of "approval," argue petitioners, the mechanical act of signing the document left the legislative process incomplete. Furthermore, they contend that because the mayor eventually issued his veto of the ordinance within 10 days of its presentation to him, which the city council failed to override, the legislation cannot have the force of law. We find none of these arguments convincing.

■ The fact that the Los Angeles City Charter requires the mayor to approve an ordinance, either by his signature or through inaction, only demonstrates that the mayor is vested with discretionary power over the lawmaking authority of the council. Under such a governing scheme, the mayor, while considering an ordinance presented to him for his approval, is acting in his legislative capacity (cf. *Lukens* v. *Nye* (1909) 156 Cal. 498, 501 [105 P. 593]; 82 C.J.S (1953) Statutes, § 47, p. 74); and the requirement of his signature "is for the purpose of registering his approval of the measure." (*Pacific P. Assn.* v. *Huntington Beach* (1925) 196 Cal. 211, 219 [237 P. 538, 40 A.L.R. 782].) This is in contrast to municipalities where the head of the governing unit, be it the mayor of the city council or the president of a board of trustees, has only a ministerial duty to sign ordinances as an act to authenticate the decisions of the lawmaking body. (*Id.* at pp. 218-219.)

■ Moreover, under the Los Angeles City Charter, an ordinance is still in the process of being adopted while it is in the possession of the mayor. (*McClain* v. *Wirsching* (1932) 215 Cal. 469, 472 [11 P.2d 392].) During the time the legislation is under his custody and control, there is nothing to prevent the mayor from reconsidering any action as to his approval or disapproval of the ordinance. However, as demonstrated by decisions from this state and other jurisdictions, it must be concluded that once a chief executive has relinquished possession of legislation with his signature and

transmitted it to the appropriate depository agent (in our case the city clerk), the measure's character as a properly enacted law becomes immutable.[3]

In *City of Atlanta* v. *East Point Amusement Company* (1966) 222 Ga. 774 [152 S.E. 2d 374], the mayor of Atlanta approved and forwarded an ordinance, which rezoned a certain tract of property, to the clerk of the board of aldermen. The next day, however, he had the clerk return the ordinance to him for his veto. (*Id.*, 152 S.E.2d at p. 375.) Applying the principle that once a chief executive allows legislation to leave his control and be lodged with the appropriate custodian of records, the Georgia Supreme Court found the mayor had been divested of his authority to veto the ordinance. (*Id.* at pp. 376-377.)

In *People* v. *Hatch* (1857) 19 Ill. 283, the Governor of Illinois mistakenly signed a bill, and while it remained in his possession, erased the signature and then returned the legislation back to the House of Representatives with his objections. (*Id.* at pp. 285-286.) The *Hatch* court found that the measure had not become law. It stated: "Had the Governor returned the bill with his approval upon it to the house, with the message of approval, and without objections, then we think the act would have been beyond his control, and he could not retract his approval, although made by mistake, unless withdrawn by the consent of the house; or had he deposited the law, with his approval upon it, with the Secretary of State, then it would have passed beyond his control and its *status* would have become fixed and unalterable; except by appeal; although his approval may have been signified by mistake." (*Id.* at p. 287, italics in original.)

Finally, in *State* v. *Whisner* (1886) 35 Kan. 271 [10 P. 852] a defendant in a criminal matter alleged that the law under which he was prosecuted had not been properly enacted because after the Governor had signed the legislation and delivered it to the Secretary of State, the chief executive made known certain objections he had to the bill. (*Id.*, 10 P. at p. 858.) The *Whisner* court rejected the contention, observing that "[a]fter the bill, therefore, had been approved and signed by [the Governor], and he had deposited the same with the [Secretary of State], it passed beyond his control. Its *status* then had become fixed and unalterable, so far as he is concerned." (*Id.* at p. 859, italics in original.)

For more than a century, the rule in California has been that the only evidence admissible to challenge the passage of a statute in the Legislature is

---

[3]Article 4, section 44, subdivision 2 of the Los Angeles City Charter provides: "The City Clerk shall have the custody of, preserve, and responsible for . . . the city ordinances . . . and shall keep a suitable record of the same."

whether it has been properly enrolled in both houses, authenticated, and deposited with the Secretary of State. In *Sherman* v. *Story* (1866) 30 Cal. 253, plaintiff, a taxpayer, contended that a military poll tax had been repealed by an act of the Legislature. Defendant, the tax collector for the City and County of San Francisco, argued that the statute revoking the tax was void because certain amendments rejected by the Assembly were included in the final bill signed by the Governor. To support his position, the defendant introduced at trial the bill as it was sent from the Senate to the Assembly, the amendments allegedly made by an Assembly committee, and oral testimony. (*Id.* at pp. 255-256.) The California Supreme Court held that the defendant's evidence was incompetent to impeach the validity of the legislation's passage. The *Sherman* court adopted the common law rule that the only evidence admissible to assail the passage of a bill in the Legislature was the record showing whether the measure had been properly enrolled, authenticated, and deposited with the Secretary of State. (*Id.* at pp. 276-279; see also *People* v. *Burt* (1872) 43 Cal. 560, 564: "If an Act is properly enrolled, authenticated, and deposited with the Secretary of State, it is conclusive evidence of the legislative will at the time of its passage.")

More recently, the common law rule adopted in *Sherman* has been applied as follows: "Since the irregularity relied upon by petitioners is not apparent from a reading of the budget bill as enacted, and can be established only through extrinsic evidence, this case is not within the exception to the rule of *Sherman* v. *Story* which permits judicial inquiry if the irregularity in legislative proceedings *appears on the face of the challenged measure*. [Citations.]" (*Planned Parenthood Affiliates* v. *Swoap* (1985) 173 Cal.App.3d 1187, 1195 [219 Cal.Rptr. 664], italics added.)

As for that portion of the legislative process requiring the Governor's signature for the enacting of a bill into law, a similar exclusionary rule can be drawn from the language of our Supreme Court in *Lukens* v. *Nye, supra,* 156 Cal. 498: "[The Governor's] signature, when it is shown to have been attached, is the exclusive and conclusive evidence of his unqualified approval, and the result being law, no evidence, nor judgment of any court, can be allowed to modify or change its terms or effect, or prevent or impair its complete operative force." (*Id.* at p. 503.)

Such an exclusionary rule was utilized in the out-of-state decision of *People* v. *McCullough* (1904) 210 Ill. 488 [71 N.E. 602]. There, the Governor of Illinois first signed a bill, but later erased his signature and vetoed the legislation. The disapproved bill was then delivered to the Secretary of State. (*Id.,* 71 N.E. at p. 604.) The *McCullough* court held that oral evidence indicating it was actually the approved bill which had been forwarded to the

Secretary of State was incompetent to impeach the records of that office showing it was in possession of the vetoed legislation. (*Id.* at pp. 611-612.) And, in *Weeks* v. *Smith* (1889) 81 Me. 538 [18 A. 325], the court at 18 A., page 328 stated: "The signature of the governor to an act of the legislature is conclusive evidence of executive approval against every one but himself. He alone should be permitted to dispute it, and only then while he holds control of the act, and before he shall have deposited the same in the archives of the state; for then it becomes operative, as expressing the legislative will in the form of a statute."

The need for finality explains the rationale for disallowing extrinsic evidence to impeach the validity of legislation signed by a chief executive and in the possession of the appropriate depositary officer. "For the purpose of securing certainty where doubt would be intolerable, it is a general rule of law that the regular enactment of an officially promulgated statute may not be impeached by parol evidence or oral testimony either of individual officers and members, or of strangers who may be interested in nullifying legislative action. This is true of parol evidence in contradiction of journal entries." (73 Am.Jur.2d (1974) Statutes, § 81, p. 313, fns. omitted.)

We think the exclusion of extrinsic evidence to contradict the signature of a governor, contained on the face of legislation that is in the custody of a secretary of state, should equally apply to the mayor, who is the chief executive of the City of Los Angeles, invested with the authority to approve and disapprove ordinances passed by the municipality's legislative branch.

Furthermore, we find no reason why the facts of the present case should lead to an exception to the rule that where an enactment is in the possession of the officer charged with its preservation, the only competent evidence of the law's invalidity must be found on the face of the legislation. Here, that evidence is ordinance No. 166733. The record reveals that: (1) the ordinance is in the possession of the city clerk; (2) it contains on its face the city clerk's certification that the measure was passed by the city council at its meeting of March 6, 1991; and, (3) Mayor Bradley approved the measure on March 7, 1991 by affixing his signature to the document. Without question, the ordinance is valid on its face.

Besides reassuring the city's population and its departments of government that they can rely on the action of the mayor, our decision today also serves other salutary purposes. First, it emphasizes the obvious: elected officials must give the governmental documents they sign meaningful review. Each stage of the legislative process should be afforded careful

deliberation and thought by the persons whom the public has entrusted with the power to make law. Second, it avoids the difficult situation of having the judiciary pass judgment on the veracity of the testimony of a chief executive who serves as the head of a co-equal branch of government. Lastly, it discourages politicians from using the legislative process to launch trial balloons to gauge the direction of the political winds. For example, a mayor or governor facing a backlash for approving what results to be unpopular legislation, should not be permitted to undo his or her action by conveniently announcing it was all a mistake.

While we do not dispute the truthfulness of the mayor's testimony given in the proceedings below, the policy requiring finality in the legislative process dictates that such evidence is incompetent to impeach his signature of approval when found on an ordinance in the possession of the city clerk.

The order of the trial court denying petitioners' request for a writ of mandate is affirmed.

Gates, Acting P. J., and Fukuto, J., concurred.