TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 21-201 |
| of | : | July 15, 2021 |
| ROB BONTA<br>Attorney General | : | |
| MANUEL M. MEDEIROS<br>Deputy Attorney General | : | |

_____

THE CITY OF LANCASTER has requested our permission to sue proposed defendant MICHAEL RIVES in quo warranto to oust him from his public office as a member of the Board of Directors of the Antelope Valley Healthcare District. The City alleges that ouster is required on the ground that Rives also holds a second, incompatible, public office as a member of the Board of Trustees of the Antelope Valley Community College District, in violation of Government Code section 1099.

**CONCLUSION**

There are substantial questions of law and fact as to whether membership on the Antelope Valley Healthcare District Board of Directors and the Antelope Valley Community College District Board of Trustees are incompatible public offices, thus requiring Rives to forfeit his first-held office on the Healthcare District Board of Directors.

1

Consequently, and because the public interest would be served by allowing the action to proceed, the application for leave to sue in quo warranto is GRANTED.

## BACKGROUND

On November 3, 2020, Michael Rives won election to both the Board of Directors of the Antelope Valley Healthcare District (Healthcare District) and the Board of Trustees of the Antelope Valley Community College District (Community College District). Rives assumed office on the Healthcare District board on December 8, 2020; he assumed office on the Community College District board on or about December 11, 2020.[1]

The City of Lancaster alleges that the two offices Rives holds are incompatible, and that Rives therefore forfeited his first-held seat on the Healthcare District Board when he assumed his seat on the Community College District Board. The City lies within both the Healthcare District and the Community College District; the geographical boundaries of both districts overlap.[2] The City is home to the Antelope Valley Hospital—a facility of the Healthcare District, and the only full-service, acute-care, district hospital in the area. The Antelope Valley Hospital is also located within District 3 of the Community College District, the district represented by Rives.

The City requests permission to file a quo warranto action seeking to remove Rives from the Healthcare District board, on the theory that he forfeited that seat when he later assumed an incompatible office on the Community College District board. Quo warranto is a civil action used most commonly to challenge an incumbent public official's right or eligibility to hold a given public office.[3] This form of action is codified in section 803 of the Code of Civil Procedure, which provides that "[a]n action may be brought by the

---

[1] The City's Verified Statement of Facts (see Cal. Code Regs., tit. 11, § 2(a)) alleges that Rives was sworn in "on or about December 11, 2020." Rives does not dispute this allegation.

[2] Compare Healthcare District map, https://www.avhospital.org/about-us/antelope-valley-healthcare-district/geographic- area/, and Community College District map, https://www.arcgis.com/apps/View/index.html?appid=f51a1e18db0f40448625ffd69c369981.

[3] Code Civ. Proc., § 803; *Nicolopulos v. City of Lawndale* (2001) 91 Cal.App.4th 1221, 1225; 76 Ops.Cal.Atty.Gen. 157, 162-163 (1993). The proceeding is the modern successor to the common law writ of quo warranto, a proceeding by which the Crown inquired "by what authority" a person was holding a public office. (*People ex rel. Lacey v. Robles* (2020) 44 Cal.App.5th 804, 811 (*Robles*); *Rando v. Harris* (2014) 228 Cal.App.4th 868, 875 (*Rando*); 101 Ops.Cal.Atty.Gen. 76, 77 (2018).)

attorney-general, in the name of the people of this state, upon his own information, or upon a complaint of a private party, against any person who usurps, intrudes into, or unlawfully holds or exercises any public office . . . within this state."[4]

Where a private party[5] seeks to pursue a quo warranto action to oust an incumbent public official from office, that party must first apply for and obtain the Attorney General's consent.[6]  In determining whether to consent to the proposed action, we do not attempt to resolve the merits of the controversy.   Rather, we employ a three-part analysis that considers:  (1) whether quo warranto is an available remedy under the circumstances; (2) whether the complaining party (also sometimes known as the "relator") has raised a substantial issue of law or fact concerning the official's right to hold office that warrants a judicial resolution, and (3) whether authorizing the quo warranto action will serve the public interest.[7]  Because we conclude that each of these conditions exist here, we grant the City's application to proceed in quo warranto.

## ANALYSIS

### 1.  Availability of Quo Warranto Remedy

Government Code Section 1099, subdivision (b), specifically directs that the forfeiture of an incompatible public office is "enforceable pursuant to Section 803 of the Code of Civil Procedure," which codifies quo warranto procedures.  Under section 1099, subdivision (a), a "public office" includes membership on a governmental board or body, such as a local healthcare district or a community college district.[8]  Thus, quo warranto is

---

[4] Code Civ. Proc., § 803; see *Rando*, *supra*, 228 Cal.App.4th at p. 873; 97 Ops.Cal.Atty.Gen. 12, 14 (2014).

[5] We construe section 803's reference to a "private party" to include a city.  (76 Ops.Cal.Atty.Gen., *supra*, at p. 163; see, e.g., *People ex rel. City of Alameda v. Smith* (1936) 16 Cal.App.2d 333; 100 Ops.Cal.Atty.Gen. 26 (2018); 78 Ops.Cal.Atty.Gen. 134, 134 fn. 1 (1995).)

[6] *International Association of Fire Fighters v. City of Oakland* (1985) 174 Cal.App.3d 687, 693-698. When the proposed relator is a public entity, it must submit its supportive factual evidence through a suitable representative.  (See, e.g., 78 Ops.Cal.Atty.Gen., *supra*, at p. 137 [verified declarations of mayor, city manager, and city clerk].)  In this case, the Lancaster City Manager provided the verification for the City's factual assertions.

[7] *Rando*, *supra*, 228 Cal.App.4th at p. 879; 72 Ops.Cal.Atty.Gen. 15, 20 (1989).

[8] Apart from the statutory definition cited above, both the courts and this office have

3

an available remedy here.

## 2. Substantial Issues Regarding Incompatibility

We next examine whether there are substantial issues of law or fact as to the incompatibility of the offices in question. Under the common law doctrine of incompatible offices—which predates, but greatly informs, the statutory prohibition of Government Code section 1099—an individual may not simultaneously hold two public offices if the performance of the duties of either office could have a significant adverse effect on the other.[9] "The doctrine springs from considerations of public policy which demand that a public officer discharge his or her duties with undivided loyalty."[10] We have previously explained that offices are incompatible "if there would be any significant clash of duties or loyalties in the exercise of official duties. Only one potential significant clash of duties or loyalties is necessary to make offices incompatible."[11]

---

previously concluded that a member of a healthcare district board holds a public office for purposes of an incompatible public offices analysis. (See *Eldridge v. Sierra View Local Hospital Dist.* (1990) 224 Cal.App.3d 311, 319 (*Eldridge*); 101 Ops.Cal.Atty.Gen. 81, 83 (2018); 95 Ops.Cal.Atty.Gen. 77, 78 (2012); see also 58 Ops.Cal.Atty.Gen. 323, 324 (1975).) Likewise, we have previously concluded that members of a community college board of trustees hold public offices for purposes of an incompatibility analysis. (83 Ops.Cal.Atty.Gen. 50, 51 (2000); see also 56 Ops.Cal.Atty.Gen. 556, 557 (1973).) Under the criteria established by applicable precedent, each one is a public office because it is (1) a governmental position, (2) created by law, (3) having a continuing and permanent tenure, (4) in which the incumbent performs a public function for the public benefit and exercises some of the state's sovereign powers. (See *Moore v. Panish* (1982) 32 Cal.3d 535, 545; *People ex rel. Chapman v. Rapsey* (1940) 16 Cal.2d 636, 637-640 (*Rapsey*); 98 Ops.Cal.Atty.Gen. 94, 96-97 (2015).)

[9] 101 Ops.Cal.Atty.Gen. 81, 82 (2018); 80 Ops.Cal.Atty.Gen. 242, 243 (1997); 80 Ops.Cal.Atty.Gen. 74, 75 (1997); 68 Ops.Cal.Atty.Gen. 337, 339 (1985); accord, 93 Ops.Cal.Atty.Gen. 104, 108 (2010); 87 Ops.Cal.Atty.Gen. 153, 154 (2004); see also *Mott v. Horstmann* (1950) 36 Cal.2d 388, 391 (doctrine applies where the functions of the offices concerned are inherently inconsistent); *Eldridge*, 224 Cal.App.3d, *supra*, at p. 319 (same).

[10] 68 Ops.Cal.Atty.Gen., *supra*, at p. 339; 63 Ops.Cal.Atty.Gen. 623, 625 (1980); 17 Ops.Cal.Atty.Gen. 129, 130 (1951).

[11] 87 Ops.Cal.Atty.Gen., *supra*, at p. 154, quoted in *Robles*, *supra*, 44 Cal.App.5th at p. 819.

In 2005, the Legislature codified the common law doctrine by enacting Government Code section 1099.[12]  That statute provides, in relevant part:

> (a) A public officer, including, but not limited to, an appointed or elected member of a governmental board, commission, committee, or other body, shall not simultaneously hold two public offices that are incompatible. Offices are incompatible when any of the following circumstances are present . . . :

> (1) Either of the offices may audit, overrule, remove members of, dismiss employees of, or exercise supervisory powers over the other office or body.

> (2) Based on the powers and jurisdiction of the offices, there is a possibility of a significant clash of duties or loyalties between the offices.

> (3) Public policy considerations make it improper for one person to hold both offices.

> (b) When two public offices are incompatible, a public officer shall be deemed to have forfeited the first office upon acceding to the second.  This provision is enforceable pursuant to Section 803 of the Code of Civil Procedure.

> * * * *

> (f) This section codifies the common law rule prohibiting an individual from holding incompatible public offices.[13]

In an uncodified section of the bill that enacted section 1099, the Legislature declared, "Nothing in this act is intended to expand or contract the common law rule prohibiting an individual from holding incompatible public offices.  It is intended that courts interpreting this act shall be guided by judicial and administrative precedent concerning incompatible public offices developed under the common law."[14]  Accordingly, in conducting our analysis, we look to both Government Code section 1099 and to

---

[12] Stats. 2005, ch. 254, § 1; see Assem. Jud. Com., Analysis of Sen. Bill No. 274 (2005-2006 Reg. Sess.), as amended June 20, 2005 (hearing date July 5, 2005), p. 3.

[13] Gov. Code, § 1099.

[14] Stats. 2005, ch. 254, § 2.

5

precedent established under the common law.

In a 2010 indexed letter,[15] we concluded that the prohibition against holding incompatible public offices precluded a person from simultaneously holding the positions of Los Medanos Community Health District board member and Contra Costa Community College District board member, public offices with overlapping geographical and subject matter jurisdiction.[16] We reaffirm that analysis and conclusion here.[17]

The City asserts that the Healthcare District provides healthcare services to the community, including to the Community College District. It further alleges that the Healthcare District and the Community College District contract with each other to engage in mutual programs, including but not limited to a "School Affiliation Agreement," which provides for the clinical training of Community College District nursing students at Healthcare District facilities, using Healthcare District personnel and materials.

In support of its verified statement, the City submitted an authenticated copy of the School Affiliation Agreement between Antelope Valley Hospital (a facility of the Healthcare District) and Antelope Valley College. The contract is comprehensive, with an emphasis on patient and student-participant health and safety. It encompasses the allocation of obligations and responsibilities between the parties, intellectual property security, confidentiality of patient records and compliance with HIPAA, and releases from liability, among other matters.[18] The contract will expire by its terms—presumably subject to renegotiation—on June 30, 2023, which would be during Rives's tenure on the two

---

[15] "An indexed letter is different from a formal opinion of the Attorney General, which is widely disseminated throughout the state and is ultimately published in bound volumes. Indexed letters are kept in the Attorney General's four libraries and are ordinarily made available to interested members of the public upon request." (*California Coastal Com. v. Quanta Investment Corp.* (1980) 113 Cal.App.3d 579, 594, fn. 11.)

[16] Indexed Letter 09-208 (Dec. 15, 2010).

[17] In the indexed letter, we rendered an advisory opinion under Government Code section 12519, in which we concluded *as a matter of law* that the offices in question were incompatible. Here, we exercise our discretionary "gate keeping" responsibility pursuant to Code of Civil Procedure section 803, in which we answer the separate question of whether the City has raised a *substantial issue of fact or law that warrants judicial resolution*.

[18] The acronym HIPAA refers to the Health Insurance Portability and Accountability Act of 1996. (42 U.S.C. § 1320d.)

contracting boards if his dual office holding were to continue.[19]

In our view, the possibility of a future contract renegotiation is, in itself, enough to demonstrate an instance of incompatibility. Evidence of an actual "past or present conflict in the performance of the duties of either office is not required for a finding of incompatibility; rather, it is sufficient that a conflict *may* occur "'in the regular operation of the statutory plan.'"[20] The rule prohibiting simultaneous occupancy of incompatible offices "does not await the occurrence of an actual clash before taking effect, but intercedes to prevent it."[21] Neither is it necessary that the potential clash of duties exist in all or even in the greater part of the official functions; it is enough when the holder of the two offices "cannot *in every instance* discharge the duties of each."[22] Thus, only "one potential significant clash of duties or loyalties is necessary to make offices incompatible."[23] And

[19] Members of both boards are elected to four-year terms. (Health & Saf. Code, § 32100; Ed. Code, § 72023.) Rives did not verify his opposition as required by our regulations. (Cal. Code Regs., tit. 11, § 3.) Nevertheless, his unverified statement did not dispute the existence of the School Affiliation Agreement. Rives does challenge the "validity" of the agreement that was attached to the City's verified statement, because the college president's signature was not accompanied by a date. However, the signatures are accompanied by the following recitation: "THE PARTIES HERETO have executed this Agreement *as of the day and year first above written*" (emphasis added), and the face of the first page of the contract bears the entry: "'Effective Date': 07/01/2020." In any event, the copy of the School Affiliation Agreement that was submitted in support of the City's application was authenticated under oath by the City's declarant. (Verified Statement of Facts, ¶ 14 & Exh. A.) Against such authentication, Rives's unsworn attempted impeachment of the exhibit is not persuasive. (See, e.g., 8 Ops.Cal.Atty.Gen. 221, 223 (1946) [unverified statement of facts not persuasive against direct evidence produced by proposed defendant, leave to sue denied].)

[20] 87 Ops.Cal.Atty.Gen. 142, 145 (2004) (citation omitted); see also 75 Ops.Cal.Atty.Gen. 112, 116 (1992) (finding lack of actual disputes or negotiations between community services district and school district to be "immaterial" to application of doctrine); 63 Ops.Cal.Atty.Gen., *supra*, at p. 624 (absence of significant interactions between city and airport district not determinative; potential interaction sufficient to render offices incompatible).

[21] *Robles*, *supra*, 44 Cal.App.5th at p. 107, fn. 8, quoting 93 Ops.Cal.Atty.Gen. 110, 111 (2010).

[22] *Rapsey*, *supra*, 16 Cal.2d at pp. 642, citations omitted, emphasis added; *People ex rel. Dep. Sheriffs' Assn.* (1996) 49 Cal.App.4th 1471, 1481.

[23] 85 Ops.Cal.Atty.Gen. 60, 61 (2002); accord 101 Ops.Cal.Atty.Gen. 56, 61-62 (2018).

it is immaterial that Rives might choose to absent himself from negotiations or consideration of a new contract. "The ability of an officer to abstain when a conflict arises will not obviate the effects of the doctrine."[24]

Section 1099 specifies that offices are incompatible if, "[b]ased on the powers and jurisdiction of the offices, there is a possibility of a significant clash of duties or loyalties between the offices."[25] Because the statute provides no specific definition for the term "significant," we apply traditionally accepted rules of statutory construction and give the word its ordinary meaning.[26] We have previously reasoned that a clash is "significant" if it is not trivial and is more certain than mere chance.[27] Given this understanding of the key analytical terms, we find there to be a clear potential for a significant clash of loyalties with respect to the School Affiliation Agreement. At a minimum, negotiating agreements from both sides of the table entails a division of loyalties for a dual officeholder.[28] Although we consider this clash by itself sufficient to raise a substantial question as to the incompatibility of the two offices, an examination of each office's additional powers only reinforces that determination.

Healthcare districts, in general, enjoy a wide array of governmental powers. For example, under Health and Safety Code section 32121, the board of directors of a healthcare district, may, among other things:

- purchase, lease, and use property of every kind and description;
- exercise the right of eminent domain to acquire real or personal property for district needs;
- do any and all things necessary for, and to the advantage of, a healthcare facility and a nurses' training school, or a child care facility for the benefit of employees of the healthcare facility or residents of the district;
- operate or assist in the operation of health facilities, health services, or

---

[24] 73 Ops.Cal.Atty.Gen. 357, 363 (1990).

[25] Gov. Code, § 1099, subd. (a)(2).

[26] See, e.g., *Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 244; *In re Eureka Reporter* (2008) 165 Cal.App.4th 891, 897; 101 Ops.Cal.Atty.Gen., *supra*, at pp. 85-86; 64 Ops.Cal.Atty.Gen. 905, 908 (1981); 60 Ops.Cal.Atty.Gen. 4, 7 (1977).

[27] 93 Ops.Cal.Atty.Gen., *supra*, at p. 108.

[28] See, e.g., 102 Ops.Cal.Atty.Gen. 39, 47 (2019). And of course, the dual officeholder could also have conflicting loyalties if a contract dispute arose during the term of the present contract.

healthcare programs and activities;

- operate or assist in the operation of free clinics, diagnostic and testing centers, health education programs, wellness and prevention programs, and healthcare groups and organizations that are necessary for the maintenance of good physical and mental health in the communities served by the district;
- establish and carry on its activities through joint ventures or partnerships; and
- do any and all other acts and things necessary to carry out the law on healthcare districts.[29]

Health and Safety Code section 32123 separately authorizes a healthcare district board to purchase, build on, or rent real property, and section 32124 separately authorizes a board to "establish a nurses' training school in connection with a hospital, prescribe a course of study for such training and . . . provide for the issuance of diplomas to graduate nurses."[30] Section 32126.5 authorizes the board of directors to enter into contracts for the provision of healthcare services to communities within the district, provide assistance or make grants to nonprofit provider groups and clinics already functioning in the community, and finance experiments with new methods of providing adequate healthcare.[31]

The powers of a community college district board are likewise broad in scope. Under Education Code section 70902, these include powers to:

- contract for the procurement of goods and services, hold and convey property for the benefit of the district, and acquire by eminent domain any property necessary to carry out district functions;
- provide auxiliary services as deemed necessary to achieve district purposes;
- receive and administer gifts, grants, and scholarships; and
- initiate or carry on any program or activity, or otherwise act in any manner, that is not in conflict with the purpose for which community college districts are established.[32]

The statute also requires a community college district governing board to establish policies for and approve academic plans and programs, courses of instruction and

---

[29] *See* Health & Saf. Code, § 32121.

[30] Health & Saf. Code, §§ 32123, 32124.

[31] Health & Saf. Code, § 32126.5.

[32] Ed. Code, § 70902.

educational programs, and individual courses.[33]  Such academic and educational programs include associate degree and registered nursing programs,[34] and community service and adult classes in health and health education.[35]  Other statutes specifically authorize the governing board of any community college district to establish and maintain child development centers,[36] lease real property and buildings to be used by the district,[37] and sell or lease out real or personal property that is not required for district purposes.[38]

It is apparent, then, that the governing boards of healthcare districts and community college districts have many common powers and responsibilities, and that these may clash and lead to divided loyalties on the part of a dual office holder.  For example, the Healthcare District and the Community College District may wish to exercise the power of eminent domain in connection with the same property or, indeed, the property of the other based on an asserted higher public use.[39]  They may otherwise compete in the same real estate market for the acquisition of real property, or may enter into certain transactions with each other for the transfer of property.  In each of these situations, the interests of the Healthcare District and the Community College District may conflict or diverge.

Indeed, the School Affiliation Agreement is a telling example of the exercise of overlapping powers.  Two separate statutes authorize a healthcare district to design, establish, and support a nurses' training school.  It is entirely conceivable that the Healthcare District and the Community College District might, during Rives's tenure, compete for participants, instructors, or other qualified staff for any of these kinds of programs.  There is also the potential for conflict involving hospital expectations and community college supervision in respect to the clinical nursing program.[40]  And the best interests of the two districts might differ in other ways as well.

---

[33] Ed. Code, § 70902, subds. (b)(1), (b)(2).

[34] Ed. Code, §§ 78261, 78261.5

[35] Ed. Code, §§ 78300, 78401.

[36] Ed. Code, § 79120.

[37] Ed. Code, § 81330.

[38] Ed. Code, §§ 81360, 81430, 81450.

[39] See Code Civ. Proc., §§ 1240.610, 1240.660.

[40] Cf. *Chevlin v. Los Angeles Community College Dist.* (1989) 212 Cal.App.3d 382 (suit for money damages by nuclear-medicine technology student against community college district, arising out of student's participation in program at VA hospital established by contract between hospital and community college district).

There is, accordingly, significant potential for the occurrence of conflicts in the regular operation of each district's statutory plan.[41] Even in establishing or maintaining projects involving cooperation, collaboration, or assistance, as permitted by the governing statutes of the two types of districts, a member of the governing board of both districts is placed on both sides of the negotiating table.[42] Rives has provided no facts or argument to refute the City's allegations of potential conflicting loyalties.[43] We conclude that the City has raised substantial questions of fact and law, warranting judicial resolution, as to whether the two offices held by Rives are incompatible, thereby effecting the forfeiture of his seat on the Healthcare District Board of Directors.

### 3. Public Interest Favors Authorizing the Proposed Action

We generally find that the existence of a substantial question of fact or law regarding the lawfulness of an incumbent public official's right or title to office is a sufficient "public purpose" to warrant granting leave to sue, absent countervailing circumstances not present here (such as pending litigation or the short duration of the official's remaining term).[44] In addition, we believe that allowing the City to sue in quo warranto here will serve the public interest in both conclusively determining whether the offices in question are incompatible and ensuring that public officials avoid conflicting loyalties in performing their public

---

[41] Cf. 76 Ops.Cal.Atty.Gen. 81, 85 (1993) (conflict could arise where both entities may enter into contracts involving matters of mutual concern with third parties); 82 Ops.Cal.Atty.Gen. 74, 75 (1999) (conflict could arise where both entities authorized to construct sewer facilities).

[42] See 85 Ops. Cal. Atty. Gen. 239, 241 (2002); 68 Ops.Cal.Atty.Gen. 171, 173 (1985), quoting Cal.Atty.Gen., Indexed Letter, No. IL 75-22 (Feb. 18, 1975) (conflict results from fact that same person sits on both sides of an agreement); 17 Ops.Cal.Atty.Gen., *supra*, at p. 130 (stating that "[t]he public is entitled to have the full *undivided* services of each public officer") (emphasis added).

[43] Rives does allege multiple conflicting interests under the Political Reform Act involving both officials of the City of Lancaster and members of the Healthcare District Board. We presume these allegations are meant to impugn the City's motives in pursuing this action. But whatever the merits of these unsworn allegations, they are irrelevant to our concern here: whether a quo warranto proceeding is warranted to resolve the question whether Rives may lawfully hold both of the offices at issue here. (See, e.g., 95 Ops.Cal.Atty.Gen. 67, 75 (2012) [immaterial that proposed relator may have improper motives in pursuing quo warranto]; 76 Ops.Cal.Atty.Gen. 1, 4 (1993) [dismissing as irrelevant objection that proposed relator's application was politically motivated].)

[44] 98 Ops.Cal.Atty.Gen., *supra*, at p. 101; 95 Ops.Cal.Atty.Gen., *supra*, at p. 87.

11

duties.[45]

Accordingly, having concluded that quo warranto is an available and appropriate remedy, that the City has raised substantial legal and factual issues as to the compatibility of the two public offices Rives now holds, and that the public interest favors resolving these issues in a judicial proceeding, we GRANT the City's application for leave to sue in quo warranto.

*****

---

[45] In support of its application, the City submitted a copy of a letter from the Healthcare District board (Rives not participating) to the Lancaster City Council, supporting the City's quo warranto effort. While the subjective views of either board are not material to our determination of incompatibility, it is evident that granting the City leave to proceed in quo warranto will facilitate the settlement of a divisive issue that otherwise threatens to impede the work of the Healthcare District board, to the prejudice of the public interest.

12